Marcus BENJAMIN, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2006–SC–000620–MR.

Supreme Court of Kentucky.

Oct. 23, 2008.

Julia Karol Pearson, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Jeffrey Allan Cross, Criminal Appellate Division, Office of the Attorney, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

Appellant, Marcus Benjamin, appeals as a matter of right his murder conviction from a Graves Circuit Court jury, wherein he was sentenced to life imprisonment. This Court now reviews his conviction pursuant to Kentucky Constitution § 110(2)(b).

Appellant raises multiple issues on appeal, to wit: 1) an alleged violation of *Brady v. Maryland,* in which Appellant claims the Commonwealth failed to provide him with certain exculpatory evidence; 2) whether the trial judge erred by allowing a combination instruction for murder and for denying an Extreme Emotional Disturbance instruction; 3) the admissibility of taped confessions at trial; 4) whether certain inadmissible hearsay statements denied Appellant his confrontation rights; 5) whether the trial judge properly denied Appellant's request for funding for expert witnesses; 6) the introduction of Appellant's prior convictions under Kentucky Rule of Evidence 404(b); and 7) whether the prosecution acted inappropriately during discovery and closing arguments.

For reasons that shall be set forth below, we hereby reverse Appellant's conviction and remand for retrial.

## I. BACKGROUND

In late August 2004, Michelle Benjamin visited Appellant, her husband, with whom she had been recently estranged. They agreed that Michelle would take Appellant to visit his children from a previous relationship later that week. On the evening of September 1, Appellant and Michelle again met and began consuming alcoholic beverages. Testimony indicated that the two often argued when one or both were drinking. By all accounts, the relationship had been troubled, and throughout their marriage various allegations of mutual infidelities and arguments concerning Appellant's children were sources of conflict. On the night in question, Appellant had allegedly been informed that Michelle was having an extramarital affair with his cousin.

The argument resumed the following morning, as the two again quarreled over the alleged infidelities, with the altercation eventually becoming physical. Thereafter, Michelle told Appellant that he could no longer see his children.

Appellant alleged that Michelle was the initial aggressor, in a physical altercation which quickly spun out of control, and eventually resulted in Michelle's tragic death. Details of the precise sequence of events leading up to Michelle's death are unclear. According to Appellant's confession, he indicated he could remember very little of what happened, stating that he was "in and out" during the altercation and then remembers arriving in Murfreesboro, Tennessee to see his children.

On September 3rd, Michelle's body was found in the closet of her apartment under a pile of her own clothes. It was determined that she had died from manual strangulation. The next day Appellant turned himself in to the Mayfield Police Department for her death.

Appellant's and the Commonwealth's version of the subsequent events differ, though it is manifest that Appellant's ensuing meetings with detectives resulted in two taped confessions. Appellant claims, however, that the confessions were given under coercion.

The first confession occurred on September 5th, wherein Appellant told Detective Ty Jackson that he knew that he had killed Michelle. Appellant claimed that he could not remember many details of the dispute and asked to see Michelle's body in order to refresh his memory. Appellant stated that he remembered an argument about allegations of mutual unfaithfulness.

Thereafter, on September 7th, Jackson took Appellant to view the body at the funeral home where a second taped confession was received. Appellant again indicated remembering parts of the argument, in particular that it became physical. Appellant stated that Michelle attacked him and that he pushed her away multiple times before the altercation became deadly. When prompted, Appellant said that he remembered squeezing [her neck]. Appellant then stated that, at the time, he did not know where he was and that the next thing he recalled was being at his mother's house. Appellant also claimed to have confessed to family members during this time. By his own admission, Appellant indicated during this confession that he was aware that he had killed Michelle, but stated that he did not realize what he was doing at the time.

Appellant was subsequently convicted at trial and sentenced to life imprisonment.

## II. ANALYSIS

A. **Alternative Perpetrator Evidence and Alleged Violation of *Brady v. Maryland*.**

1. **Necessity of Materiality**

In his first assignment of error, Appellant claims that the Commonwealth failed to provide him certain exculpatory evidence as required under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and in so doing, undermined his capacity to present a defense. We disagree, as the evidence did not impact Appellant's fundamental rights since it was not material to his guilt.

Appellant argues that the prosecution failed to reveal evidence of an alternative perpetrator before trial, thus violating his due process rights. At trial, Detective Morrison testified that upon learning of Michelle Benjamin's death, he initially thought that Tim Brown may have had something to do with the murder. Tim Brown was a known drug dealer in the area and Michelle, who had been working with the Mayfield Police Department as an informant, had made some allegations against Brown. Appellant alleges that he and counsel were unaware that police had considered an alternative perpetrator until hearing Morrison's testimony at trial. Appellant's counsel moved for a mistrial upon grounds of a *Brady* violation.

■ In *Brady,* the United States Supreme Court ruled that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–1197. Implicit in *Brady*'s requirement of materiality is a concern that the suppressed evidence affected the outcome of the trial. *See United States v. Agurs,* 427 U.S. 97, 109, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). However, in *Agurs,* the Supreme Court indicated that an item of undisclosed information is not rendered material by the mere possibility that it may have helped

the defense or might have affected the trial. *Id.* at 109–110, 96 S.Ct. at 2400.

Thereafter, in *United States v. Bagley,* the Supreme Court further revised the materiality requirement, stating that irrespective of the request, evidence is considered material only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the trial would have been different. 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). The Court then indicated that in the context of this different result consideration, a reasonable probability was one sufficient to undermine confidence in the outcome. *Id.*

Admittedly, reasonable probability and materiality are nebulous concepts at best. However, the notion was perhaps best clarified in *Kyles v. Whitley,* wherein the Supreme Court articulated

> *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (*quoting Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381).

Here, Appellant argues that by not disclosing, before trial, that police had initially considered Tim Brown as an alternative perpetrator, the prosecution suppressed evidence that was both favorable to his defense and material to his guilt. Moreover, Appellant claims that without this disclosure, he did not receive a fair trial or

a verdict worthy of confidence, thus violating his due process rights.

### 2. Appellant's Right to Present a Defense was Not Violated.

■ Although we are unpersuaded by Appellant's argument, even assuming *arguendo* that information concerning Brown should have been disclosed, it cannot be credibly argued that information concerning an alternative perpetrator was in any way material, as Appellant confessed—at least twice—to the crime in question *prior* to Brown ever being developed as a suspect. Significant in the materiality analysis is the chronology and flow of incoming information during the early stages of investigation into Michelle's murder.

On Thursday September 3rd, Michelle's body was found in the closet of her apartment. Detective Morrison testified that when he learned of Michelle's death he immediately thought that Tim Brown might be implicated in some manner. However, on Friday September 4th, Appellant turned himself in. On Monday September 7th, Appellant confessed to Detective Jackson, disclosing key details about the murder which led authorities to reasonably conclude that he was the killer. Appellant then asked Jackson to take him to the funeral home where Michelle's body was located so that he could view it. While at the funeral home, Appellant then made his second taped confession and once again provided significant details concerning the murder. Additionally, there was also testimony to the effect that Appellant had confessed to the murder to various family members before being charged.

Detective Morrison testified that when he learned Appellant had confessed to the murder, Brown ceased to be a suspect in the investigation. Therefore, it is entirely reasonable to conclude that given the very brief period of time wherein Brown was in any way considered in the investigation, and the fact that Appellant confessed on multiple occasions, providing substantial details regarding the murder that only the killer could know, the prosecution's failure to provide information on Brown in no way impacted Appellant's capacity to present a defense. Although Appellant waxes hyperbolic as to how failure to disclose this information in discovery undermined confidence in the trial court's verdict, we are disinclined to agree, as we find no reasonable probability that possession of the evidence would have led to a different result or that its absence undermines confidence in the verdict. *See Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566. Thus, there was no *Brady* violation, as the evidence was not material under *Agurs* or *Kyles*.

### 3. The Trial Court Properly Refused Appellant's Request for a Mistrial.

■ Here, the record does not indicate that the suppression of the alternative perpetrator evidence provided a manifest necessity for granting a mistrial because no *Brady* violation occurred. *See Gould v. Charlton Co., Inc.*, 929 S.W.2d 734, 738 (Ky.1996) ("It is universally agreed that a mistrial is an extreme remedy and should be resorted to only when there is a fundamental defect in the proceedings which will result in a manifest injustice. The occurrence complained of must be of such character and magnitude that a litigant will be denied a fair and impartial trial and the prejudicial effect can be removed in no other way."). As such, the trial court properly denied Appellant's request for a mistrial. *See Woodard v. Commonwealth*, 147 S.W.3d 63, 68 (Ky.2004) (holding that the decision to grant a mistrial is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion).

## B. Jury Instructions

### 1. Absence of Extreme Emotional Disturbance Instruction

Appellant next argues that the trial court erred in failing to include an instruction pertaining to extreme emotional disturbance as an element of the jury's murder instructions. We agree.

The quandary of how extreme emotional disturbance (EED) should figure into the murder statute, KRS 507.020(1), has provided substantial difficulty for litigants, trial courts, and juries within the Commonwealth for a considerable period of time now. Indeed, this Court has oft wrestled with the appropriate interplay between who assumes the burden of proving its existence and, when established, its proper configuration within the statutory pattern.

We recently sought to clarify the current status of the law concerning EED in *Greene v. Commonwealth,* 197 S.W.3d 76 (Ky.2006). In *Greene,* we reiterated a line of cases which held that the presence of evidence which supports a finding of EED necessitates an instruction including it as a statutory element of murder. *Id.* at 81; *see also Wellman v. Commonwealth,* 694 S.W.2d 696, 697 (Ky.1985) (if evidence of EED is presented, defendant is afforded reasonable doubt in that respect); *Spears v. Commonwealth,* 30 S.W.3d 152, 154 (Ky. 2000) (Commonwealth must disprove element beyond a reasonable doubt); *Coffey v. Messer,* 945 S.W.2d 944, 946 (Ky.1997) (once evidence of EED is introduced, the absence thereof becomes an element of the offense of murder).

■ Thus, once evidence has been introduced establishing EED as a statutory element, the burden then shifts to the Commonwealth to affirmatively disprove its existence. *Greene,* 197 S.W.3d at 81. However, we have qualified this requirement by relieving the Commonwealth of an affirmative duty to prove the non-existence of EED if "such proof is already present." *Id.* However, if evidence, taken in the light most favorable to the Commonwealth, has

been established, which puts the existence of EED in dispute, the Commonwealth has met its burden and the existence of EED becomes a question for the jury. *See Spears,* 30 S.W.3d at 155.

As we noted in *Spears,* EED is the functional successor to the common law "sudden heat of passion," and was introduced into our jurisprudence with the adoption of the Kentucky Penal code. *Id.* at 154–155. Although the two are seemingly analogous, the evolution of EED has interposed clear and marked distinctions between them, two of which bear upon our consideration of the present issue: namely, (1) notions of what constitutes adequate provocation and (2) the subjective rather than objective dichotomy of the provoking circumstances.

This Court has articulated the definition of extreme emotional disturbance as being "a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes." *McClellan v. Commonwealth,* 715 S.W.2d 464, 468–469 (Ky.1986). This comprehensive definition has been reconciled with recent case law to establish how extreme emotional disturbance may manifest itself.

Adequate provocation, or a "triggering event," was established as a necessary element of EED in *Fields v. Commonwealth,* 44 S.W.3d 355, 359 (Ky.2001). The dissimilarity in the way common law "sudden heat of passion" and EED approach what constitutes adequate provocation arises in the rejection of a "flash point" in extreme emotional disturbance analysis, as well as a requirement that there be a subjectively reasonable excuse for the disturbance. *Id.*

■ While we have recognized that provocation adequate to induce an EED

analysis must be sudden and uninterrupted, we have consistently held that this event need not be contemporaneous with the triggering event. *Foster v. Commonwealth,* 827 S.W.2d 670, 678 (Ky.1991). Unlike "heat of passion," the triggering event for extreme emotional disturbance may "fester in the mind" before surfacing to exact its damage. *Springer v. Commonwealth,* 998 S.W.2d 439, 452 (Ky.1999). We have further suggested that such a delayed event may be the "impact of a series of related events" with no specific time frame between the triggering event and the actual homicide. Lawson and W. Fortune, *Kentucky Criminal Law* § 8–3(b)(3), at 342 (*citing California v. Wharton,* 53 Cal.3d 522, 280 Cal.Rptr. 631, 809 P.2d 290 (1991) and *Pennsylvania v. Whitfield,* 475 Pa. 297, 380 A.2d 362 (1977)). However, as we have previously stated, there exists a "subsidiary inquiry" as to whether there intervened between the provocation and the homicide a cooling-off period sufficient enough to preclude a conclusion that the provocation was adequate. *Fields,* 44 S.W.3d at 359.

■ These sound principles ensure that EED is not so constrained as to be attainable only through instantaneous reactions, yet not so lenient as to allow convenient abuse of the mitigating effects of the doctrine. As a result, this Court need not limit its consideration to only those events immediately prior to the actual crime; our review may well consider all circumstances leading up to and surrounding the commission of the crime.

The second distinction between "heat of passion" and extreme emotional disturbance is found in the transition from the historical objective reasonableness standard to one of subjective reasonableness, where reasonableness is determined from the perspective of the defendant. KRS 507.020(1)(a) states that "a person shall not be guilty under this subsection if he acted under the influence of extreme emotional disturbance for which there was a *reasonable explanation or excuse,* the reasonableness of which is to be *determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be.*" (emphasis added).

■ On appeal, the reviewing court must make a determination as to the sufficiency of the evidence. *Greene,* 197 S.W.3d at 82. If the evidence, viewed in the light most favorable to the Commonwealth, is found sufficient, *it is for the jury to find whether or not the defendant acted under extreme emotional disturbance. Id.*

■ In the present instance, we find that there was sufficient evidence at trial to place the issue before a jury to render a finding of fact. The night before the homicide, Marcus Benjamin was confronted with allegations of infidelity as well as the news that his wife had been engaging in an extramarital affair with a family member. The following morning, the victim returned and the argument between the two resumed, this time including assertions that Benjamin would never see his children again. Further, Benjamin claims that he was physically attacked by the victim during this final argument, at which point the altercation turned deadly. This series of events, *while not necessarily establishing that extreme emotional disturbance existed,* is wholly sufficient to warrant an instruction for EED for the jury's benefit. Therefore, the trial court committed reversible error by failing to instruct the jury on EED.

### 2. Combination Murder Instruction

Appellant, in his third allegation of error, argues that his constitutional right to a unanimous verdict was denied as a result of the trial court's combination jury in-

struction. Although we have reversed Appellant's conviction on other grounds, we will, nevertheless, explore the matter in hopes that upon retrial, the trial court will include separate form verdicts which allows the jury to distinguish its findings, or separate murder instructions, if the court determines the evidence does not support a combination instruction.

At trial, the jury was given a combination murder instruction which permitted it to find Appellant guilty of either intentional or wanton murder. KRS 507.020(1). The instruction read:

> You will find the Defendant guilty of Murder under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> A. That in this county on or about September 2, 2004, and before the finding of the indictment herein, he killed Michelle Benjamin by asphyxiation by strangulation.
>
> AND
>
> B. That in so doing:
>
> 1. He caused the death of Michelle Benjamin intentionally;
>
> OR
>
> 2. He was wantonly engaging in conduct which created a grave risk of death to another and thereby caused the death of Michelle Benjamin under circumstances manifesting a grave indifference to human life.

During guilt phase deliberation, the jurors submitted the following question to the trial judge: "When deciding the charges for murder, do we have to select if we feel he committed the crime intentionally or wantonly, meaning our decision will read murder (1) or (2)?" The trial judge sent a reply back which simply read, "No."

In *Hudson v. Commonwealth,* 979 S.W.2d 106, 109 (Ky.1998), a case with quite similar factual circumstances, we refrained from finding reversible error in the combination jury instruction given, which was substantially identical to that above, noting the "instruction followed the pattern set forth in 1 Cooper, *Kentucky Instructions to Juries (Criminal)* § 3.24." However, we also warned, " '[t]he danger of committing reversible error by giving this instruction can be avoided by using form verdicts requiring the jury to state whether guilt is found under section B(1) or B(2).' " *Id.* (quoting 1 Cooper, *Kentucky Instructions to Juries (Criminal)* § 3.24, comment).

██ The problem, of course, is that when questions as to the sufficiency of evidence to support both mental states arise, such an instruction brings into question the unanimity of a verdict if the jury is not allowed to distinguish its findings of guilt upon wanton or intentional murder. As we have repeatedly noted, " '[a]n instruction of an alternative nature is proper only when either theory (intentional/wanton) is reasonably supported by the evidence.' " *Hudson,* 979 S.W.2d at 109 (quoting *Barbour v. Commonwealth,* 824 S.W.2d 861, 863 (Ky.1992)); *cf. Wells v. Commonwealth,* 561 S.W.2d 85, 88 (Ky. 1978) (holding "that a verdict can not be successfully attacked upon the ground that the jurors could have believed either of two theories of the case where both interpretations are supported by the evidence and the proof of either beyond a reasonable doubt constitutes the same offense.").

Therefore, when the evidence will support either mental state beyond a reasonable doubt, a combination murder instruction is certainly proper. However, in *Hudson* we cautioned, "we strongly emphasize that, when intentional and wanton murder are included in a single instruction, the preferred practice is to include a form verdict that requires the jury to state

whether guilt is found under the theory of intentional murder or under the theory of wanton murder," in hopes that trial courts would heed our request to curb the practice of utilizing form verdicts which do not require the jury to indicate under which theory guilt was found. *Id.* at 110. Alas, the practice has persisted in the Commonwealth and has reared its head before this Court on far too many occasions.

Appellant argues that his combination instruction violated his substantive constitutional rights. In *Schad v. Arizona,* 501 U.S. 624, 640, 111 S.Ct. 2491, 2501, 115 L.Ed.2d 555 (1991), the United States Supreme Court indicated that combination jury instructions implicate a criminal defendant's right to a unanimous verdict under the Due Process Clause of the Fourteenth Amendment. In its opinion, the Supreme Court reserved explicitly passing judgment on the permissible limits of defining criminal intent in a state's statutory scheme, noting such a question was more properly within the scope of state courts and legislatures. *Id.* at 636, 111 S.Ct. at 2499. The Court did note, however,

> [i]f, then, two mental states are supposed to be equivalent means to satisfy the *mens rea* element of a single offense, they must reasonably reflect notions of equivalent blameworthiness or culpability, whereas a difference in their perceived degrees of culpability would be a reason to conclude that they identified different offenses altogether.

*Id.* at 643, 111 S.Ct. at 2503.

In the Commonwealth, we have not found that the use of two mental states as alternative notions to satisfy the *mens rea* for murder is repugnant to due process. *See Wells,* 561 S.W.2d at 87. Yet, the use of Due Process as a yardstick for verdict specificity supports the demands of fundamental fairness, and Kentucky has long followed this tradition. *See Schad,* 501

U.S. at 637, 111 S.Ct. at 2500. At common law, murder included killing with malice aforethought, and malice aforethought included both intentional and wanton *mens rea.* This is reflected in the Model Penal Code, which Kentucky has adopted. Thus, while history and current practice support the use of intentional and wanton mental states as being equivalent means to satisfy the *mens rea* element of KRS 507.020, we remain troubled by the improper utilization of combination verdict forms which do not require the jury to distinguish its findings when there is a question as to the sufficiency of evidence to support both. We do not, however, suggest that is the case here.

■ Therefore, we reiterate our prior directive: when giving combination jury instructions reflecting distinct theories of culpability which bear equal punishment, trial courts should preliminarily determine if there is evidence to support a combination instruction; if the trial judge finds that the evidence is unlikely to support a combination instruction, the court should include separate verdict forms, and if the evidence suffices, the court may use a combination instruction which permits the jury to distinguish upon which theory it bases its findings.

■ In the present instance, at trial, Appellant's counsel contemporaneously objected to the form of the verdict, asserting that the two mental states should be presented on separate pages. Here, the jury was confused by the combination instruction, as evidenced by their submission of a request for clarification to the trial judge. When the jury submitted their question, counsel asked for a mistrial, arguing that a unanimous verdict must be reached. The judge may have been correct in telling the jury they did not have to select a theory, as evidence may well have supported both theories. One could read the jury's re-

quest to suggest the jury was not unanimous, as did perhaps Appellant's counsel. On the other hand, the request may have just reflected jury confusion as to the proper manner of the verdict. We will refrain from making such determination here, as it is unnecessary. Nonetheless, it is better practice in these instances to either set forth the separate theories on separate verdict forms or when a combination instruction is given, require the jury to specify on the verdict upon which theory they find. Then the problem which arose here is alleviated.

## C. Appellant's Confessions were Properly Admissible as they were Voluntarily Given.

Appellant's fourth assignment of error is that his taped confessions should have been suppressed as they were involuntary and the product of coercion. We disagree.

In *Bailey v. Commonwealth,* we recognized that the Due Process Clause requires confessions be made voluntarily in order to be admissible, noting that " '[if the defendant's] will has been overborne and his capacity for self-determination critically impaired, the use of [the] confession offends due process.' " 194 S.W.3d 296, 300 (Ky.2006) (*quoting Schneckloth v. Bustamonte,* 412 U.S. 218, 225–226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)). The standard for assessing the voluntariness of a confession is the totality of the circumstances in which the confession was given. *Mills v. Commonwealth,* 996 S.W.2d 473, 481 (Ky.1999). Similarly, the United States Supreme Court has indicated that the "ultimate test" of voluntariness is whether "the confession [was] the product of an essentially free and unconstrained choice by its maker[.]" *Schneckloth,* 412 U.S. at 225, 93 S.Ct. at 2047.

In this regard, this Court has stated that when determining if a confession is a result of coercion, "one must look at the totality of the circumstances to assess whether police obtained evidence by overbearing the defendant's will through making credible threats." *Henson v. Commonwealth,* 20 S.W.3d 466, 469 (Ky. 1999). Thus, in making this determination, the Court should consider three factors in determining whether a confession was coerced: (1) "whether the police activity was 'objectively coercive,' " (2) "whether the coercion overbore the will of the defendant," and (3) whether the defendant has shown that the "coercive police activity was the 'crucial motivating factor' " behind his confession. *Id.* (*quoting Morgan v. Commonwealth,* 809 S.W.2d 704, 707 (Ky. 1991)). Upon review of the record, it is abundantly clear that Appellant's confessions were voluntarily given and were not the product of coercion.

Appellant was arrested on Friday, September 4th, after turning himself in to the Mayfield Police Department. On September 5th, Appellant indicated that he wanted to speak with Detective Jackson. During their initial contact, it had been discovered that Jackson was a friend to a relative of Appellant. Jackson met with Appellant, read him his rights, and confirmed Appellant understood them. During the taped interview, which was played before the trial judge, Jackson informed Appellant that he has some other charges coming, including "some big ones," that "things don't look good," and that the current matter was a capital offense. Jackson also told Appellant that he believed he committed the offense and if he killed his wife, he should come clean to keep himself out of "the chair." Appellant then asked for counsel, whereupon the interview immediately ceased.

On September 7th, Appellant again asked to speak with Detective Jackson. Jackson came to meet with Appellant and again read him his rights, confirming that he understood them. Upon this meeting, Appellant asked Jackson to allow him to view his wife's body to refresh his memory as to what happened. Appellant confessed to the murder during this interview. Later that same day, Appellant was taken to view his wife's body at the funeral home where it was located. While there, Appellant once more confessed to the murder in a taped audio and video confession.

Appellant now alleges that his confessions were involuntary as they were the product of coercive police activity. Principally, Appellant claims that police engaged in overreaching behavior by indicating to him (and allegedly some family members) that he could face the death penalty. Also, Appellant argues that the delay in receiving appointed counsel, despite his immediate request, exacerbated the overreaching nature of police activity.[1]

However, in light of the totality of the circumstances under which Appellant's confessions were made, we find their admission proper. We find nothing in the record to indicate the police activity was objectively coercive, that it overbore the will of the defendant, or that the tactics utilized were the crucial motivating factor behind the confession. *See Henson,* 20 S.W.3d at 469. As such, Appellant's confessions were the free and independent choice of their maker. *See Schneckloth,* 412 U.S. at 225, 93 S.Ct. at 2047. There was nothing improper about the police's conduct in this instance, or their truthful, non-coercive advisement of potential penalties. *See Simmons v. Bowersox,* 235 F.3d 1124, 1133 (8th Cir.2001).

Moreover, a suppression hearing was held below, at the conclusion of which, the trial judge made detailed findings on the record and denied Appellant's motion to suppress, noting that Appellant had initiated contact with Jackson and waived his rights by speaking with him. When a trial judge's decision on a motion to suppress is supported by substantial evidence, and is correct as a matter of law, such findings are conclusive. *Commonwealth v. Neal,* 84 S.W.3d 920, 923 (Ky.Ct.App.2002); RCr 9.78.

**D. Introduction of Inadmissible Hearsay was Cured by Trial Court's Admonition.**

 In his fifth assignment of error, Appellant claims that certain inadmissible hearsay denied him his confrontation rights. We disagree, though such evidence should not be elicited upon retrial.

During trial, the Commonwealth introduced testimony from Detective Jackson, concerning a statement by Debra Brown. Debra Brown was the mother of Tim Brown, an alleged drug dealer who had been briefly considered a suspect in the investigation. Michelle was a confidential informant who had given police information on Tim Brown.

The substance of the first instance of hearsay testimony contained a statement where Jackson asked Ms. Brown whether she had heard anything about Michelle's murder, with Jackson indicating that he was able to charge Appellant based on statements given to him by Appellant's family. Appellant objected and moved for a mistrial. The trial judge overruled the motion, but sustained the objection and admonished the jury to disregard the testimony on the basis that it was hearsay.

---

1. It should be noted that the time frame in question was September 3–8, 2004. Monday, September 6, 2004, was Labor Day, a national holiday.

The second instance of hearsay occurred during the Commonwealth's cross-examination of Jackson, where Jackson indicated that Ms. Brown had told him that Appellant had confessed to his family. Appellant again objected to the testimony and moved for a mistrial. The motion for a mistrial was again denied. However, after a bench conference, the trial judge gave the following admonishment:

> Alright, I want to admonish the jury that that's been let in for a specific purpose. Debra Brown is not here to be cross-examined by anyone, so we don't know if that's true or not. So you're not to consider it for whether Debra Brown was telling the truth or not. You can consider that statement only for the effect it had on the officer's investigation and for no other purpose.

 It is well-settled law within the Commonwealth that a "jury is presumed to follow an admonition to disregard evidence; thus, the admonition cures any error." *Combs v. Commonwealth*, 198 S.W.3d 574, 581 (Ky.2006). Moreover,

> There are only two circumstances in which the presumptive efficacy of an admonition falters: (1) when there is an overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant; or (2) when the question was asked without a factual basis *and* was "inflammatory" or "highly prejudicial."

*Id.* at 581–582 (*quoting Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky.2003)) (emphasis in original).

As neither exception applies here, we find the trial judge's admonition sufficient to cure any error as a matter of law. *Combs*, 198 S.W.3d at 581.

## E. Appellant's Request for Funds for Expert Witnesses was Properly Denied.

Appellant claims, in his sixth assignment of error, that the trial court erred to his substantial prejudice when it denied his request for funds to hire a psychologist or psychiatrist to assist in preparation of his defense.

Specifically, Appellant argues that the trial court improperly denied funding to seek expert assistance, which was necessary for purposes of establishing extreme emotional disturbance as a mitigating defense. Therefore, the question becomes: whether the trial court's refusal to grant funds to Appellant to hire an expert witness substantially impaired his rights when Appellant requested such funding generally, and did not testify at trial, but where there were sufficient facts in evidence to warrant a jury instruction on the matter.

 KRS 31.110(1)(b) establishes that a needy defendant charged with serious crimes "is entitled … 'to be provided with the necessary services and facilities of representation including investigation and other preparation.'" *Hicks v. Commonwealth*, 670 S.W.2d 837, 838 (Ky.1984) (*quoting* KRS 31.110(1)(b)). Additionally, in *Young v. Commonwealth*, 585 S.W.2d 378, 379 (Ky.1979), we recognized that "indigent defendants are entitled to reasonably necessary expert assistance." Thus, while it is settled law that indigent defendants are entitled to funding for expert assistance, the dilemma of under what circumstances and to what extent such funding should be provided has elicited considerable deliberation.

In *Hicks*, we found that such determinations should be adjudged by a "reasonably necessary standard." 670 S.W.2d at 838. However, this has proven an evasive and amorphous standard, and while vesting the

trial courts with great discretion, it provided little in the way of direction to assist them in determining when they are obligated to aid indigent defendants.

In *Simmons v. Commonwealth*, 746 S.W.2d 393, 395 (Ky.1988), we attempted to further refine the parameters of when expert funding is reasonably necessary. In *Simmons*, we articulated that a certain level of specificity was required in demonstrating such reasonable necessity for expert assistance. *Id.* Therein, the Court noted:

> The appellant failed to show a necessity for the expert assistance he requested. He stated in general terms only that expert assistance was needed to prepare adequately for trial and possible sentence hearing. He did not state the names of any doctor or social worker that he desired to examine him, nor did he furnish any estimate of the cost. He further did not state what he expected to show or in what manner the requested assistance would be of any specific benefit to him. He made no challenge to the competency of Dr. Ravani or that Dr. Ravani was uncooperative with him or was not available for consultation.

*Id.* Clearly then, the *Simmons* Court sought to establish a specificity requirement in demonstrating an articulable need for expert funding, seeking to alleviate the threat of continuous undeveloped assertions by a defendant leading to unsupported "fishing expeditions" at the Commonwealth's expense. *Id.; see also McCracken County Fiscal Court v. Graves*, 885 S.W.2d 307, 314 (Ky.1994).

This Court recognized the due process implications inherent in providing indigent defendants financial access to experts in *Crawford v. Commonwealth*, 824 S.W.2d 847, 850 (Ky.1992). In *Crawford*, we acknowledged the United States Supreme Court's decision in *Ake v. Oklahoma*, 470 U.S. 68, 70, 105 S.Ct. 1087, 1089, 84 L.Ed.2d 53 (1985), noting that "when the mental state of a defendant is 'seriously in question,' due process requires a state to provide access to a competent psychiatrist to assist in evaluation, preparation, and presentation of the defense." *Crawford*, 824 S.W.2d at 850. Ake established a balancing approach for determining when an indigent defendant should be afforded access to psychological evaluation, weighing the competing interests of the government and the individual against the probable value and risk of error involved if access is not afforded. *Ake*, 470 U.S. at 77, 105 S.Ct. at 1093.

However, in *Crawford* we also noted that *Ake* did not support the proposition that an indigent defendant had the right to *choose* a psychiatrist or receive funds to hire one of his choosing; nor did it entitle him to additional state funds simply because he was unhappy with the results of an initial examination. *Crawford*, 824 S.W.2d at 850.

Therefore, acknowledging the aforementioned, we are of the opinion that the appropriate test for determining when an indigent defendant is entitled to receive funding for expert witnesses under KRS 31.110(1)(b), will consider 1) whether the request has been pleaded with requisite specificity; and 2) whether funding for the particularized assistance is "reasonably necessary"; 3) while weighing relevant due process considerations. Upon review, however, this Court's analysis is limited to whether the trial court has abused its discretion. *Davenport v. Commonwealth*, 177 S.W.3d 763, 773 (Ky.2005); *Dillingham v. Commonwealth*, 995 S.W.2d 377, 381 (Ky. 1999).

Here, Appellant's counsel made an initial request for an *ex parte* hearing to request funding on February 28, 2005. In that

motion, Appellant indicated in general terms that he "wished to consult experts in order to render effective assistance and build an effective defense," adding that experts were needed to analyze the evidence and potentially testify at trial. The hearing was held on March 7th, wherein Appellant gave the name of the expert he wished to hire and stated that he wished to be evaluated for evidence of lack of criminal responsibility and to support an EED defense. The trial judge took the matter under submission and entered an order on March 15th, denying Appellant's motion.

On March 28th, Appellant's counsel asked for evaluation by a state facility. This request was granted. Appellant was evaluated for competency and criminal responsibility and found competent.

Thereafter, on July 11th, Appellant's counsel again filed a motion seeking expert funding, which was substantially similar to the first. The trial judge denied the motion on July 20th.

Nearly one year later, on May 30, 2006, *the day trial began*, Appellant's counsel had an in-chambers hearing with the trial judge, wherein he argued that an expert would be able to explore Appellant's lack of memory of the murder, give context to what occurred, and discuss a possible triggering event for the murder. Appellant argued that such information would be beneficial in supporting an EED defense. The trial judge denied the request.

■ Here, it is significant to note that Appellant's initial request lacked the requisite specificity to demonstrate a reasonable necessity under the law. Moreover, Appellant was initially requesting funding to hire an expert *of his choosing*. The trial judge was entirely proper in denying such request. *Crawford,* 824 S.W.2d at 850.

■ Further, Appellant *did* receive a competency and criminal responsibility evaluation at a state facility. As in *Crawford* and *McCracken,* Appellant was not entitled to state funding to conduct a fishing expedition simply because he was unhappy with the results. Moreover, while Appellant's request on the first day of trial was pleaded with specificity, the trial judge properly denied such request, given the Commonwealth's interest in judicial economy and the fact that Appellant had already received a state funded evaluation. Thus, the trial judge's decision did not offend due process. *Crawford,* 824 S.W.2d at 850.

> At the outset, a defendant is not entitled to an additional state-provided examination or funds to hire additional experts simply because the initial evaluation is contrary to his defense. Nor does the fact that an additional evaluation might be beneficial to the defense add credence to his claim. In the subject case, appellant was afforded the constitutionally and statutorily required expert assistance and, as such, the trial court's refusal to provide additional examinations or funds did not violate his due process rights.

*Id.* (*citing U.S. v. Baldi,* 344 U.S. 561, 568, 73 S.Ct. 391, 395, 97 L.Ed. 549 (1953) and *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)). Here, the trial judge held at least three hearings on the matter and duly considered all the reasons set before him. Taking into consideration the findings from the state evaluation and Appellant's arguments, the trial judge determined that additional expert funding was not reasonably necessary. Therefore, there was no abuse of discretion.

Thus, in the present instance, we find that the trial court was proper in denying Appellant's request for funding; Appellant had already availed himself of a state psychiatric evaluation, and his requests, other

than the request on the first day of trial, were not pleaded with requisite specificity.

## F. Prior Bad Acts Evidence

Appellant claims in his penultimate allegation of error, that the trial court erred in permitting the Commonwealth to introduce evidence of his prior conviction for domestic violence under KRE 404(b).

Prior to trial, the trial judge held an evidentiary hearing pertaining to the admissibility of Appellant's prior conviction for assaulting Michelle some months prior to her murder. At the hearing the Commonwealth argued that it intended to introduce such evidence to show motive for her murder and an absence of mistake. After hearing arguments from both sides, the trial judge ruled the evidence admissible.

 It is well-settled that a "the standard of review of an evidentiary ruling is abuse of discretion." *Anderson v. Commonwealth,* 231 S.W.3d 117, 119 (Ky.2007). We find no such abuse here.

Under KRE 404(b), evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, such evidence may be admissible if "offered for some other purpose, such as *proof of motive,* opportunity, intent, preparation, plan, knowledge, identity, or *absence of mistake or accident.*" KRE 404(b)(1) (emphasis added). Moreover, this Court has instituted a three-part inquiry for assessing the admissibility of prior bad acts evidence under KRE 404(b), which includes examining the relevance, probativeness, and prejudice associated with the prior crime. *Bell v. Commonwealth,* 875 S.W.2d 882, 889 (Ky.1994) (*citing* Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.25(II) (3d ed.1993)).

 In the present instance, upon review, we find nothing to indicate that the trial court abused its discretion or that the complained of evidence fails the three-part inquiry under *Bell.* Here, Appellant's prior conviction for assaulting his wife lends plausibility to the notion that Appellant intentionally murdered his wife, had a motive to do so, and that the killing was not a mistake. The prior conviction was relevant under KRE 401, in that it tended to render Appellant's intent more probable than it would have been without the existence of the evidence. Likewise, the evidence was probative in that it suggested Appellant had motive to murder his wife. Finally, we are disinclined to find that the "potential for prejudice from the use of other crimes evidence substantially outweigh[s] its probative value." *Bell,* 875 S.W.2d at 890. As such, the evidence was properly admissible and the trial judge did not abuse his discretion. *See Anderson,* 231 S.W.3d at 119.

## G. Prosecutorial Misconduct

In his final assignment of error, Appellant argues that prosecutorial misconduct infected his trial and that the prosecution acted improperly during discovery and penalty-phase closing arguments. We disagree.

Appellant argues that the Commonwealth engaged in misconduct by not disclosing alleged alternative perpetrator evidence pertaining to Tim Brown during discovery. As we have previously addressed this issue,[2] we see no need to reexamine the issue here as it is without merit.

Suffice it to say, Brown was never developed as a suspect. No *Brady* violation

**2.** *See* section II.A., *supra.*

occurred, and the Commonwealth was not obligated to disclose information pertaining to Brown during discovery. Moreover, information pertaining to Brown was not material to the question of guilt. *Pennsylvania v. Ritchie,* 480 U.S. 39, 55–56, 107 S.Ct. 989, 1000–1001, 94 L.Ed.2d 40 (1987).

 In addition, Appellant argues that the prosecutor engaged in misconduct when he stated "we have to think about the message that we need to send to this defendant [to] prohibit, to prevent this type of unlawful activity." It is true that this Court has repeatedly indicated that "send a message" statements are improper in the Commonwealth and prosecutors should not engage in such argument. *See, e.g., Brewer v. Commonwealth,* 206 S.W.3d 343, 350 (Ky.2006); *Commonwealth v. Mitchell,* 165 S.W.3d 129, 130–133 (Ky. 2005). We reiterate this admonition here, but note that this isolated statement was hardly egregious.

 Thus, viewing the prosecution's closing argument as a whole, we find no error. *See Young v. Commonwealth,* 25 S.W.3d 66, 75–76 (Ky.2000). However, the prosecution should not address the jury in such a manner upon retrial.

### III. CONCLUSION

Accordingly, for the reasons set forth herein, we hereby reverse Appellant's conviction for murder and remand for a new trial.

All sitting. MINTON, C.J.; ABRAMSON, NOBLE, SCHRODER and VENTERS, JJ., concur. CUNNINGHAM, J., concurs in result only.