RENDERED:  OCTOBER 29, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2019-SC-0692-DGE

CABINET FOR HEALTH & FAMILY
SERVICES, COMMONWEALTH OF
KENTUCKY

APPELLANTS

V.            ON REVIEW FROM COURT OF APPEALS
NOS: 2018-CA-0172; 2008-CA-0173; 2018-CA-0174;
2018-CA-0175; 2018-CA-0176; 2018-CA-0177
HONORABLE ROBERT MATTINGLY, JUDGE
CALLOWAY CIRCUIT COURT NOS:
2016-J-0150-001; 2016-J-0151-001; 2017-J-0093-001

K.S., MOTHER
L.M., FATHER

APPELLEES

## OPINION OF THE COURT BY JUSTICE LAMBERT

## AFFIRMING IN PART AND REVERSING IN PART

The Unified Juvenile Code, in multiple instances, expressly provides a right to counsel to indigent parents.  This case is about whether Kentucky law grants indigent parents a right to state-funded expert witnesses in the absence of express statutory language providing for such assistance.  Specifically, the issues are: (1) whether KRS[1] 620.100(1)(b) grants indigent parents a right to state-funded expert witnesses and (2) if not, whether the Kentucky Constitution, as a matter of due process, guarantees this right.

---

[1] Kentucky Revised Statute

# I. FACTUAL BACKGROUND

On the afternoon of October 15, 2016, K.S. ("Mother") set off for a job interview at a local hotel, leaving her two children, D.M., age thirteen months and L.M., age three months, in the care of their father. While walking to the hotel, Mother decided to call father, also L.M. ("Father"), to tell him about seeing his sister as she left their apartment. Before, she could tell her story, Father informed her that something was wrong with L.M. Mother rushed back to the apartment and found Father standing outside holding L.M. Mother claimed that L.M. appeared pale and seemed to be having trouble breathing. In a panic, Father flagged down a passerby, who took Father and L.M. to Murray-Calloway County Hospital. Mother, accompanied by D.M. and other family members, followed closely behind.

Emergency staff observed that L.M. had bruising above his right eye. Further testing revealed a brain hemorrhage. The hospital sent L.M. to Vanderbilt University Medical Center for additional testing and treatment. Members of the Vanderbilt Child Abuse Response and Evaluation (CARE) team engaged in a comprehensive medical evaluation of L.M. The written report of this evaluation stated that testing revealed the presence of a subdural hematoma around L.M.'s skull, indicia of a recently healed rib fracture, and indicia of possible past fractures. The CARE team concluded that the injuries were consistent with child abuse given the nature of the injury, the age of the child, and the lack of a clear exculpatory explanation by the parents.

On the same day, Appellant, the Cabinet for Health and Family Services ("The Cabinet"), filed dependency, neglect, and abuse ("DNA") petitions on behalf of L.M. and his older sibling, D.M., based on risk of harm. The Cabinet subsequently obtained an emergency custody order for both children. The Calloway County Family Court held a Temporary Removal Hearing on October 21, 2016. Prior to the hearing, the court determined that both Mother and Father were indigent and appointed each party separate counsel. At the hearing, the Cabinet was granted temporary custody of both children.

Four months later, at a pre-trial conference, counsel for Father orally requested funds to hire a medical expert to review the findings of the Vanderbilt CARE team. Counsel for Mother joined this request. The parties "agreed at the conference for the Court to appoint the Pediatric Medical Team out of Louisville, Kentucky to review the findings of Vanderbilt and submit an assessment."[2] On March 8, 2017, the court entered an order explaining that the Louisville-based physicians refused to examine the CARE team's report. The court also explained that the Cabinet claimed it lacked statutory authority to provide parents with funds for medical experts.

From this point, the case languished for several months. Before an adjudication hearing could be held, Mother gave birth to a third child, N.M. Within two days of the child's birth, the Cabinet sought and received temporary

---

[2] Order of March 8th, 2017, Case Nos: 16-J-0150-001 and 16-J-0151-001.

custody of N.M. based on the risk of future harm posed by the parents' continued custody.

During this interim period, Dr. Spencer Romaine of the Orthopedic Institute of Western Kentucky examined the Calloway County x-ray images of L.M.'s ribs. Counsel for Father filed a letter from Dr. Romaine summarizing his interpretation of the images. Dr. Romaine opined that he did not observe any apparent abnormalities to the rib area, with the caveat that no radiology interpretation was available.

Eventually, after withdrawal of both parents' initial counsel and the appointment of new counsel, an adjudication hearing was held on December 4, 2017. At the hearing, the Commonwealth presented testimony from Dr. Cody Penrod, a member of the CARE team at Vanderbilt. Dr. Penrod's testimony effectively summarized the team's written report. He testified that the tests performed disclosed a healed fracture of L.M.'s fourth left rib and a subdural brain hemorrhage. On examination, Dr. Penrod acknowledged that the x-ray from Murray-Calloway County Hospital did not show a rib fracture but clarified that the imaging suggested that the fracture had recently healed.

Mother presented testimony concerning her general treatment of the children and L.M.'s previous medical incidents. In particular, L.M.'s regular physician, Dr. Kimberly Burch, testified that Mother reported that L.M. seemed to have difficulty breathing within hours of his birth. Mother's counsel asked both Dr. Penrod and Dr. Burch whether a subdural hematoma could result from a difficult vaginal birth. Both physicians stated that it was possible,

4

though they had not examined any records supporting that Mother endured a difficult delivery.

Following the hearing, the court partially completed the form adjudication orders, finding that L.M. and D.M. and N.M. were neglected or abused but failed to complete Section B of the Conclusions of Law. Left undetermined was who inflicted the injuries or created a risk for injuries. Based on these findings, the court generally determined that each of the children was neglected or abused while under the care of Mother and Father.

After disposition, both parents appealed the family court's findings. The Court of Appeals reversed the family court, holding that KRS 620.100(1)(b) granted indigent parents a right to funding for reasonably necessary expert assistance. The court reasoned that the statute's reference to KRS Chapter 31 supported a contextual right to expert assistance in DNA cases. Thus, the court remanded the case to the trial court for a determination of whether Mother and Father were entitled to funding according to the test in *Benjamin v. Commonwealth*.[3] We granted discretionary review.

## II. ANALYSIS

### A. KRS 620.100(1)(b)

Kentucky law provides indigent parents with a statutory right to counsel in proceedings which threaten their fundamental right to care and custody of

---

[3] 266 S.W.3d 775 (Ky. 2008).

their children.[4]  By statute, indigent parents in DNA proceedings must receive counsel appointed by the court and paid through the Finance and Administration Cabinet.[5]  The Court of Appeals found that KRS 620.100(1)(b) also entitled indigent parents to state-funded expert assistance.

We review a lower court's interpretation of a statute *de novo*.[6]  We begin, as we always do, with the text of the statute.[7]  KRS 620.100(1)(b) states: "The court shall appoint separate counsel for the parent who exercises custodial control or supervision if the parent is unable to afford counsel pursuant to KRS Chapter 31".  Here, the dispute hinges upon the effect of the phrase "pursuant to KRS Chapter 31".

Because the statute does not define "pursuant to" in a special, legal sense, we look to the ordinary meaning of the phrase.[8]  And in determining a phrase's ordinary meaning, dictionaries are a good place to start.[9]  "Pursuant to" means "in a way that agrees with or follows (something)" or "in accordance with (something)."[10]  Here, both parties appear to agree that the term should

---

[4] *See e.g.*, KRS 620.100(1)(b)(dependency, neglect, and abuse proceedings); KRS 625.080(3)(involuntary termination of parental rights proceedings); KRS 199.502(non-consensual adoption proceedings).

[5] KRS 620.100(1)(b).

[6] *Garrard Cty. v. Middleton,* 520 S.W.3d 746, 748 (Ky. 2017).

[7] *Id.* at 750 (citing *Owen v. Univ. of Kentucky,* 486 S.W.3d 266, 270 (Ky. 2016) ("[T]he first rule [of statutory construction] is that the text of the statute is supreme").

[8] *Bailey v. Reeves,* 662 S.W.2d 832, 834 (Ky. 1984)("We have a duty to accord to words of a statute their literal meaning unless to do so would lead to an absurd or wholly unreasonable conclusion.").

[9] *Kentucky Props. Holding LLC v. Sproul,* 507 S.W.3d 563 (Ky. 2016).

[10] MERRIAM–WEBSTER DICTIONARY (online ed.); *see also pursuant to,* BLACK'S LAW DICTIONARY (11th Edition 2019) ("in compliance with" or "in accordance with").

carry this ordinary meaning. The question, however, is *what* exactly must follow or be in accordance with KRS Chapter 31.

Mother adopts the Court of Appeals' reading of the statute, contending that the appointment of counsel *as a whole* must be in accordance with KRS Chapter 31. Under this reading, an indigent parent must receive the same procedural protections given to indigent criminal defendants under Chapter 31, including the guarantee of the "necessary services and facilities of representation" in KRS 31.110.[11] The Cabinet, on the other hand, interprets KRS 620.100's reference to Chapter 31 only to incorporate the test for determining whether a parent is indigent.

We find the latter view to be the correct one. Mother's construction of the statute clashes with a natural reading of KRS 620.100(1)(b). Between the phrases "shall appoint separate counsel" and "pursuant to KRS Chapter 31," the General Assembly included the phrase "if the parent is unable to afford counsel." This phrase immediately precedes the reference to KRS Chapter 31 and is not set off by any form of punctuation. The grammar and structure of the sentence indicates that the phrases "if the parent is unable to afford counsel" and "pursuant to KRS Chapter 31" must be considered together. Under this reading, counsel shall be appointed only if a party is determined to be indigent according to the process set out in KRS Chapter 31.

---

[11] *See* KRS 31.110(1)(b).

7

Consideration of KRS 620.100 in the context of similar statutes—both in the Unified Juvenile Code and beyond—supports this interpretation.[12] Three other statutes in the Unified Juvenile Code set forth a right to counsel for indigent parties:

- KRS 199.502(3), governing petitions for adoption where the biological parent does not consent, states: "[the Court] shall determine if the [biological parent] is indigent and, therefore, entitled to counsel pursuant to KRS Chapter 31.

- KRS 625.080(3), governing involuntary termination of parental rights cases, states: "[the Court] shall determine if the parent is indigent and, therefore, entitled to counsel pursuant to KRS Chapter 31".

- KRS 625.0405(1), governing voluntary termination of parental rights cases, states: "if the court determines pursuant to KRS Chapter 31 that the requesting parent is indigent, the court shall appoint an attorney … to represent the parent."

Outside of the parental rights setting, the General Assembly uses similar language for the purpose of determining whether a litigant is indigent. KRS 534.030 states that fines shall not be imposed "upon any person determined to

---

[12] *See Jefferson Cty. Bd. of Ed. v. Fell*, 391 S.W.3d 713 (Ky. 2012)("The particular word, sentence, or subsection under review must also be viewed in context…other relevant parts of the legislative act must be considered in determining the legislative intent.").

be indigent *pursuant to KRS Chapter 31*."[13]  The common thread binding each of these provisions is the use of the provisions of KRS Chapter 31 to determine if a party cannot afford counsel.  Put simply, these statutes use the language "pursuant to Chapter 31" to point Courts towards a body of rules they should use to determine if a party is indigent; they do not indicate a broader incorporation of KRS Chapter 31.

In sum, the phrase "pursuant to Chapter 31" when used in the context of the right-to-counsel provisions of the Unified Juvenile Code carries with it a consistent meaning.  The phrase as used in KRS 620.100(1)(b) incorporates only those provisions of KRS Chapter 31 necessary to determine if a litigant is indigent.  We hold, therefore, that KRS 620.100(1)(b) does not entitle an indigent parent to state-funded expert assistance.

### B. DUE PROCESS IN PARENTAL RIGHTS PROCEEDINGS

Next, we consider whether the due process provisions of the Kentucky and United States Constitutions require indigent parents receive access to expert assistance in dependency, neglect, and abuse cases.[14]  We hold that, under certain circumstances, parents are entitled to reasonably necessary

---

[13] KRS 530.030(4)(emphasis added); *see also* KRS 530.040 (including the same language in the statute concerning misdemeanors and violations).

[14] Before the Court of Appeals, Mother framed her due process argument as a violation of her Sixth Amendment rights.  The Sixth Amendment, however, only applies to criminal cases. *See e.g., Turner v. Rogers*, 562 U.S. 431 (2011). Nevertheless, the Court of Appeals implicitly adopted a due process analysis by incorporating the test of *Benjamin v. Commonwealth*, 266 S.W.3d 775, 789 (Ky. 2008), which relies on principles of due process.  As such, we consider the issue independent of the statutory claim.

9

expert assistance. That determination, however, is best left to the discretion of the trial court on a case-by-case basis, subject to appellate review.

Section 1 of the Kentucky Constitution provides that all citizens "are, by nature, free and equal, and have certain inherent and inalienable rights," including "the right of enjoying and defending their lives and liberties."[15] Section 1 affirms that all citizens of the Commonwealth enjoy certain fundamental rights.[16] Section 2 of the Kentucky Constitution, in turn, helps ensure that guarantee of individual liberty by forbidding the Commonwealth from exercising "absolute and arbitrary power over the lives, liberty and property" of its citizens.[17] This prohibition against arbitrary state action includes a guarantee of procedural due process at least as protective as its federal counterpart.[18] And principles of due process arising under both constitutions dictate that the Commonwealth must provide fair procedures when it seeks to deprive a citizen of a liberty interest.[19]

---

[15] KY. CONST. §1.

[16] *See Commonwealth v. Wasson*, 842 S.W.2d 487 (1992).

[17] KY. CONST. §2.

[18] *See e.g., Commonwealth Nat. Res. & Envtl. Prot. Cabinet v. Kentec Coal Co.*, 177 S.W.3d 718, 735 (Ky. 2005) (applying the federal due process framework to a claim brought under both the Fourteenth Amendment and Section 2); *Transp. Cabinet v. Cassity*, 912 S.W.2d 48, 51 (Ky. 1995).

[19] *See e.g., TECO Mechanical Contractor, Inc. v. Commonwealth*, 366 S.W.3d 386, 393 (Ky. 2012); *Mahoney v. Carter*, 938. S.W.2d 575, 576 (Ky. 1997).

It is well-established that a parent's right to custody of his or her children is a protected liberty interest.[20]  A parent's right to the "companionship, care, custody, and management of his or her children … undeniably warrants deference and, absent a powerful countervailing interest, protection."[21] As such, when the Commonwealth moves to intervene in the parent-child relationship, it "must provide the parents with fundamentally fair procedures."[22]

Two strands of case law—one federal and one unique to Kentucky— define the scope of procedural protections afforded to parents in child welfare proceedings.  First, numerous United States Supreme Court decisions stress that child welfare proceedings must adequately safeguard his or her fundamental interest in raising his or her child.  In *Stanley v. Illinois*, the Court held that due process requires the State to demonstrate that a parent is unfit before placing his child in foster care.[23]  Similarly, in *Santosky v. Kramer*, the Court held that due process requires the State to demonstrate that a parent was unfit by clear and convincing evidence before permanently terminating the

---

[20] *See e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65 (2000)( ("The liberty interest … of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *Morgan v. Getter*, 441 S.W.3d 94, 111-12 (Ky. 2014).

[21] *Cabinet for Health and Family Serv. v. K.H.*, 423 S.W.3d 204, 209 (Ky. 2014)(quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)).

[22] *Id.*

[23] 405 U.S. 645 (1972)(holding unconstitutional a presumption that unmarried fathers are unfit).

parent-child relationship.[24]  At the core of each decision lie the unique status

of a parent's liberty interest in the custody of his or her children.[25]

However, not all cases warrant the same degree of procedural protection.

For instance, in *Lassiter v. Department of Social Services,* the Court held that

parents do not have an absolute right to counsel in termination of parental

rights cases.[26]  In doing so, the Court reasoned that due process does not lend

itself to categorical rules, stating that "[due process] is not a technical

conception with a fixed content unrelated to time, place, and circumstances."[27]

Accordingly, the Court determined the question of whether due process

requires appointed counsel should be "answered in the first instance by the

trial court," taking into consideration the specific circumstances of the parties

and the facts of the case at hand.[28]

Kentucky, by statute, furnishes indigent parents with a categorical right

to counsel in several child welfare proceedings.[29]  The Cabinet asserts that this

fact should foreclose any further consideration of due process.  Essentially, it

claims that because KRS 620.100(1)(b) already gives indigent parents more

---

[24] 455 U.S. 745 (1982).

[25] *See Id.* at 758-59 ("[It is] plain beyond the need for multiple citation that a natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right.")(internal quotations omitted).

[26] 452 U.S. 18, 31-32 (1981).

[27] *Id.* at 24-25.

[28] *Id* at 31-32.

[29] *See e.g.,* KRS 620.100(1)(b) (dependency, neglect, and abuse proceedings); KRS 625.080(3)(involuntary termination of parental rights proceedings); KRS 199.502(non-consensual adoption proceedings).

process than is due under the Federal Constitution, further procedural protections may derive only from the statute itself. This argument, however, contravenes well-established principles of due process. The question of what procedures are necessary to protect a right is a question of constitutional law for a judge, not a question to be determined by state legislatures.[30] So the fact that the General Assembly decided to supply litigants with more process than is constitutionally required in one context does not insulate child welfare proceedings from further constitutional scrutiny.

In fact, multiple Kentucky cases provide more protection to indigent parents than is required either by the Federal Constitution or by the relevant statutory provisions of the Juvenile Code. For example, in *R.V. v. Com. Dept. for Health and Family Services*, the Court of Appeals held that the due process clause, as well as KRS 625.080(3) and KRS 620.100(1), require indigent parents to be represented at "every critical stage of the proceedings … [including] all critical stages of the underlying dependency proceeding."[31] There, while both parents were represented by appointed counsel throughout the adjudication of the dependency action, the trial court relieved appointed counsel before subsequent permanency and goal change hearings. During those hearings, the trial court entered erroneous factual findings regarding the

---

[30] *See Cleveland Bd of Ed. v. Loudermill*, 470 U.S. 532, 541 (1985) ("[T]he right to due process is conferred, not by legislative grace, but by constitutional guarantee").

[31] 242 S.W.3d 669, 672-73 (Ky. App. 2007).

length of time the child had been in foster care and the Cabinet changed its goal from returning the child to permanent foster care placement.

In reversing the termination of parental rights, the Court of Appeals recognized the significant impact of DNA proceedings on a parent's liberty interest:

> Kentucky's statutory scheme to protect children and to adjudicate parental rights provides a continuum of proceedings, even though a dependency action is not required prior to the filing of a termination petition. Clearly, the proceedings in a dependency action greatly affect any subsequent termination proceeding.[32]

Based on this observation, the *R.V.* court correctly reasoned that due process required further protection. In this manner, the court found a constitutional right to counsel at proceedings not explicitly covered by *Lassiter* or KRS 620.100.

Likewise, in *Z.T. v. M.T.*[33], the Court of Appeals built on the *R.V.* decision, holding that an indigent parent may bring a claim for ineffective assistance of counsel against her appointed counsel in a DNA proceeding. While the court expressed caution in allowing these claims, the court found it "logical that the parent's right to counsel includes effective representation."[34] Thus the Court concluded that "if counsel's errors were so serious that it is apparent from the record that the parent was denied a fair and meaningful opportunity to be

---

[32] *Id.*

[33] 258 S.W.3d 31 (Ky. App. 2008).

[34] *Id.* at 36.

heard so that due process was denied, this Court will consider a claim that counsel was ineffective."[35]

Certain general principles emerge from these cases. First, a parent's right to custody and care of his or her children is a uniquely important liberty interest. Second, federal and state courts, in response to the special nature of this liberty interest, impart significant procedural protections to parents in child welfare proceedings. While these procedures are less protective than criminal proceedings in which physical liberty is at stake, they are more significant than cases involving property rights.[36] Third, process depends on context. The foundational principle of procedural due process—fundamental fairness—requires courts to resist mechanical application of its prior case law. Instead, courts must appraise the value of specific procedures in light of the particular facts of the case. Kentucky case law, in reaching beyond *Lassiter* in certain circumstances, adheres to this foundational principle.

With these principles in mind, we address the question of expert funding. Kentucky case law is largely silent on the issue.[37] Courts in three other states

---

[35] *Id.*

[36] *Cf. Ake v. Oklahoma*, 470 U.S. 68, 76 (1985)(identifying that a paternity action is "quasi-criminal" in nature and that prior holdings extend greater procedural protections to litigants in such actions); *Kramer*, 455 U.S. at 758-59 (holding that a higher burden of proof is required in termination of parental rights proceedings than ordinary civil actions).

[37] This issue came before the court recently in *H.C. v. Cabinet for Health & Family Serv.*, No. 2018-CA-000164-ME, 2018 WL 3957101 (Aug. 17, 2018). We did not reach the merits, however, because reversal was warranted on procedural grounds.

15

have recognized a right to appointed experts in child welfare proceedings.[38]

Mother contends that the due process principles arising from *R.V.* and *Z.T.* similarly require the Commonwealth to provide funding when expert testimony is reasonably necessary. To determine whether fundamental fairness necessitates certain procedural protections, we look to the analytical framework set out in *Matthews v. Eldridge*.[39]

*Matthews* requires the balancing of three factors: (1) the private interest at stake; (2) the government's interest in administrative efficiency; and (3) whether the additional procedures sought will increase the accuracy of fact-finding and reduce the risk of erroneous deprivation.[40] First, the private interest. As summarized above, decades of federal and state case law foreground the strength of the private interest in this case. Moreover, while we acknowledge that DNA proceedings do not permanently remove children from their parents; children may be placed in foster care for several months at a time while a DNA case is pending.[41] Temporary or not, that is a significant

---

[38] *State ex rel. Children Youth & Families Dep't v. Kathleen D.C.*, 141 N.M. 535, 157 P.3d 714, 719 (2007)("[I]n certain circumstances, due process may require the appointment of an expert witness at the State's expense to an indigent parent in a neglect and abuse proceeding."); *In re Yarbrough Minors*, 885 N.W.2d 878, 890-92 (Mich. App 2016) (holding that due process may require appointed experts in termination of parental rights proceedings); *In re Shaeffer Children*, 621 N.E.2d 426, 431 (Oh. App.1993)(stating that due process requires the appointment of a psychiatric expert in certain permanent custody proceedings). But *see In re J.T.G.*, 121 S.W.3d 117, 130 (Tex. App.2003) (declining invitation to extend *Ake* to parental termination cases).

[39] 424 U.S. 319 (1976).

[40] Id. at 335.

[41] Here, L.M. and D.M. were in foster care for over one year before an adjudicatory hearing was held.

deprivation of liberty. Of course, DNA proceedings may evolve from a temporary out-of-home placement to permanent custody to a third party or termination of parental rights and adoption.

Second, we note that the Cabinet's interest in efficiency is two-fold. Of course, the Cabinet wishes to expend its resources in as prudent a manner as possible. That wish is legitimate.[42] But the Cabinet's pecuniary interest alone does not overcome the significance of a parent's liberty interest in the continued care of his or her children.[43] Nor is foster care without its financial cost to the citizens of the Commonwealth. The Cabinet's interest in efficiency, however, also stems from the need to ensure the well-being of children. Drawn-out court proceedings pose the risk of depriving the child of a stable upbringing and subjecting the child to repeated trauma. The efficient operation of child-welfare proceedings serves the government's interest in assuring the best interests of children in addition to guarding the Commonwealth's coffers.

Given the relative strength of the private and public interests, the final *Matthews* factor—the impact of additional procedures on accurate fact-finding—proves determinative. In certain cases, a parent's ability to understand and rebut medical testimony may be vital to the outcome of a

---

[42] *See Lassiter*, 452 U.S. at 28.

[43] See Id.

case.[44]  While trained legal counsel is capable of a great deal, lawyers are not doctors.  Nor are judges.  In cases presenting complex issues of medical or psychiatric evidence, consultation with a medical expert strengthens the ability of counsel to understand the evidence and to cross-examine the experts put on by the Cabinet.  In these cases, lack of availability of a witness with specialized knowledge increases the risk that a parent may suffer an erroneous deprivation.

However, we appreciate that many, if not most, DNA proceedings do not present significant issues of medical proof.  In those cases, or cases where there is visible evidence of abuse or significant witness testimony regarding a parent's treatment of the child, expert testimony may serve only to prolong an otherwise straightforward case.

Therefore, we decline to adopt a per se rule requiring the provision of funds for expert witnesses in every DNA case.  Rather we acknowledge, as the *Lassiter* court did, that procedural due process is a flexible concept.[45]  The benefit of expert testimony depends upon of the facts presented in a given case.  Thus, the question of whether due process requires a court-appointed expert is best left to the judgment of the trial court, subject to appellate review.  In those cases, we hold that the due process provisions of the federal and state

---

[44] *See Lassiter*, 452 U.S. at 30 ("Expert medical and psychiatric testimony, which few parents are equipped to understand and fewer still to confute, is sometimes presented.").

[45] *Id.* at 24-25.

constitutions require the Commonwealth to provide indigent parents with the assistance of an expert.

## C. BENJAMIN *IN THE CONTEXT OF DNA PROCEEDINGS*

Balancing tests like the *Matthews* framework place significant discretion in the trial court. Absent certain guideposts, courts applying a balancing test risk the appearance of deciding cases in an *ad hoc* fashion. Thankfully, Kentucky law, via *Benjamin v. Commonwealth,*[46] supplies a test more narrowly tailored to the context of expert funding.

*Benjamin* flows from the United States Supreme Court's decision in *Ake v. Oklahoma.*[47] *Ake* held that a state must provide access to a psychiatric expert when the defendant makes a threshold showing that his mental state is likely to be a significant issue. In a later decision, the Court clarified that a defendant must provide more than "underdeveloped assertions that the requested assistance would be beneficial."[48] In Kentucky, a trial court reviewing a request for expert assistance must consider (1) whether the request was pleaded with specificity; (2) whether the funding is reasonably necessary; and (3) whether due process weighs in favor of appointing an expert.[49] The

---

[46] 266 S.W.3d 775, 789 (Ky. 2008).

[47] 470 U.S. at 70.

[48] *Caldwell v. Mississippi,* 472 U.S. 320, 324 (1985); *St. Clair v. Commonwealth,* 140 S.W.3d 510, 530 (Ky. 2004).

[49] *See Benjamin,* 266 S.W.3d at 789.

purpose behind this heightened showing is to filter out "fishing expeditions" from cases presenting legitimate due process concerns.[50]

Although the *Benjamin* test arises from the criminal context, the decision presents a useful object lesson in how a court should accommodate a liberty interest amidst the risk of significant burden upon state resources. Specifically, *Benjamin*'s dual requirements of specificity and necessity guide a court's inquiry into the third *Matthews* factor by forcing litigants to confine the scope of their request. This guidance should similarly provide more clarity to both trial courts and parents as to what must be shown before a parent is entitled to expert assistance.

Applying *Benjamin* to the DNA context, a parent must include the following in their request for expert assistance. At the threshold, a parent must show in specific terms that medical or other expert testimony or assistance is likely to play a significant role in the adjudication of dependency, neglect, and abuse. In doing so, the parent must demonstrate how an expert would help her case. The request must contain more than a general affirmation that a medical or other expert would help. The requesting parent must specify the type of expert and explain why that expert is needed in light of the particular allegations of neglect or abuse set forth in the petition.

In considering the parent's request, the trial court should focus on the risk of erroneous deprivation posed by the expert's absence. The court should

---

[50] *See St Clair*, 140 S.W.3d at 530.

consider the volume and complexity of the medical or other evidence involved in the case. Additionally, the court should consider whether the medical or other evidence is likely to be a significant factor in the determination of neglect or abuse. In cases where there is significant lay witness testimony concerning the allegations or the nature of the injuries clearly suggests physical harm, the aid of an appointed expert is less likely to be necessary. In any event, the trial court should set out in specific terms on the record its reasons for approving or denying a parent's request. Appellate review of such a determination, as is the case in the criminal context, will be for abuse of discretion and limited to the reasons presented to the trial court.[51]

## D. SEPARATION OF POWERS

Finally, the Cabinet contends that requiring the Commonwealth to pay for an indigent parent's expert violates separation of powers. Yet, the Cabinet concedes that the separation of powers doctrine does not prevent a court from assessing fees when due process so requires.[52] Indeed, this must be so. Due process is a constitutional matter.[53] And it is firmly the responsibility of the Judicial Branch to ensure that proceedings in Kentucky courts are conducted in accordance with this constitutional guarantee. Our concern is that indigent parents have access to the means necessary to meaningfully participate in

---

[51] *See McKinney v. Commonwealth,* 60 S.W.3d 499, 505 (Ky. 2001).

[52] *See G.G.L v. Cabinet for Human Res.,* 686 S.W.2d 826 (Ky. App. 1985) (affirming order directing Cabinet to pay for bus fees to aid indigent parents to travel to termination of parental rights hearing because of the significant due process right to be present at the hearing.).

[53] *See Loudermill,* 470 U.S. at 541.

21

child welfare proceedings. So long as the General Assembly abides by the constitutional principles set forth in this decision, it is, of course, free to implement this right in a manner it sees fit.

### III. CONCLUSION

On the record before us, it is clear that medical evidence—specifically the findings of the CARE team and the testimony of Dr. Cody Penrod—played a determinative role in the outcome of this case. At the adjudication hearing, the sole evidence of abuse presented by the Cabinet were the findings of the Vanderbilt CARE team. Dr. Penrod noted that medical imaging showed that L.M. had a subdural hematoma and may once have had a rib fracture. While this evidence presented credible indications of physical harm to L.M., the Cabinet's primary argument as to causation relied upon a negative inference. Essentially, Dr. Penrod testified that a three-month old was unlikely to self-incur such harm and determined the parent's absence an explanation to be suspect. While this may be true, it is unclear how, without an expert, parents could have countered that testimony with anything more than supposition. Moreover, at oral argument, counsel for mother indicated that there was a history of brain bleeds on Father's side that, without an expert, went unexplored.

Finally, we note that the trial court initially agreed with the parents that an expert was needed. Based on this determination, the court reached out to medical personnel and the Cabinet for assistance. The court's subsequent

22

denial of parent's request came after both the Pediatric Medical Team and the Cabinet refused to assist.

Taken together, the parent's arguments regarding the need for expert testimony merit further consideration. Accordingly, we reverse the Court of Appeals' holding in so far as it relies on KRS 620.100, but affirm the court's reversal of the family court on constitutional grounds. We remand these for new DNA proceedings with instructions that the family court analyze the need for expert assistance prior to adjudication consistent with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Tiffany L. Yahr
Mona Sabie Womack
Assistant Counsel, Cabinet for Health & Family Services

COUNSEL FOR APPELLEES:

John Alderdice
Amy R. Roos
Murray, Kentucky