## Smiddy v. Commonwealth.

June 20, 1941.

A. M. Caddell and C. S. Wilson for appellant.

Hubert Meredith, Attorney General, and H. Appleton Federa, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

On a Sunday afternoon in June, 1940, near his residence in that portion of the city of Jellico lying in Whitley county, Kentucky, the appellant and defendant below, Bill Smiddy, murdered his wife, then seventeen years of age, by stabbing her with a knife upon various parts of her body about sixteen times, several of which wounds were fatal—particularly the one severing the jugular vein, and the one in or near the heart of his victim. He was later indicted by the grand jury of Whitley county, in which he was accused of wilful murder, and upon his trial he was convicted, with the infliction of the death punishment. His motion for a new trial was overruled and from the verdict and the judgment pronounced thereon he prosecutes this appeal, urging through his counsel as grounds authorizing a reversal: (1) that the indictment was fatally defective in containing a count under our habitual criminal statute (Section 1130 of Baldwin's 1936 Revision of Carroll's Kentucky Statutes), the defendant having theretofore been convicted of homicide, as well as of another felony; (2) that the court erred in failing to instruct the jury on the habitual criminal count of the indictment notwithstanding it (as insisted) was erroneously contained in the indictment, and (3) error in the insanity instruction given by the court.

The facts disclose about as inexcusable homicide as any with which we have ever come in contact. The parties resided in the Kentucky portion of the town of Jellico in the southern part of Whitley county, and had been married only one month and five days when the homicide occurred. They had been to church in the forenoon of the fatal day and ate dinner at the home of the wife's parents—later going from there to defendant's home, and apparently along with some acquaintances of appellant named Isaac who had in their possession some moonshine liquor. The Isaac crowd, with Smiddy and his wife and a young lady by the same name of Smiddy (who was a cousin of appellant) were in de-

fendant's home just before the killing, where the parties were seated around in the family room with Mr. and Mrs. Smiddy sitting on the side of a bed therein. Defendant took one drink of moonshine liquor, and after the expiration of something like one hour, and while he and his wife were sitting on the side of the bed, he put his arms around her and gave her a squeeze, and was otherwise carrying on in a manner that abashed her, when she said to him: "Bill, don't do that." Following that remark she got up and started to the toilet, which was an outside structure a short distance from the residence. Immediately thereafter defendant went to the front door of his residence where there were steps going to the ground (the house being on a hillside and elevated at that point), and stood there until his wife was returning from the toilet. When she arrived at the steps he put his arm around her shoulders and started away. Soon thereafter those remaining in the house, and others within the immediate surroundings, heard screams. Quick investigation disclosed that they were made by defendant's wife, and that appellant was stabbing her with his knife at the rear of a gasoline station, and that she was trying to make her way into it through its back door. She finally landed at the door and into the building with her husband following and striking at her with his knife and with the exposed parts of her body covered with blood and she practically dead. Defendant was still striking at her after she got into the station house, and said to one of its proprietors by the name of Davis: "Walter, don't try to stop me," and by his actions indicated that it would be dangerous for any one who might undertake to do so. By that time the wife was practically dead and was being carried towards the front door by her husband with his arm about her neck, and when he got to the pavement he dropped her body and ran away but was afterwards arrested. While passing through the station building the severely wounded victim appeared to still have some knowledge of her predicament and was exercising the remnant of her then very much enfeebled strength to get away from her assailant, but with force he carried her to the front door, remarking at the time to her: "You are going this way." It was also proven that as his wife dropped to the pavement in front of the station house appellant remarked: "Lay there and die, damn you, I don't care."

The above brief statement of how the homicide oc-

curred is the substance of it given by as many as or more than half a dozen witnesses who testified for the commonwealth, and it was contradicted by no witness who appeared in the case for either side, not even by defendant himself. It was proven by some of the witnesses that appellant showed some signs of intoxication but not to an extreme degree, and, of course, not to the point of affecting his locomotion. Furthermore, so far as the record discloses he had taken but one drink of the liquor, to which reference has been made. Defendant, testifying in his behalf, admitted all of the facts proven by the commonwealth up to the point of the beginning of the murderous assault he made upon his wife. He stated that upon her return from the toilet he suggested to her that they go to a nearby gondola car containing coal and procure some of it—presumptively for the purpose of cooking, since it was not needed for heating purposes at that season of the year. In narrating his testimony he said: "Me and my wife went for coal and I remember climbing up in the car and getting coal in the sack and lifted it down, and she looked up at me and smiled, and that is the last thing I remember.

"Q. Is that all you remember about it? A. Yes sir.

"Q. Where did you come to yourself at the next time you ever knowed anything? A. They woke me up in the London jail.

"Q. What day? A. On Monday."

Such is the only excuse offered by defendant for the murderous deed which he committed without the remotest excuse, according to the uncontradicted testimony, unless it was that he was provoked by his wife's objection to his fondling conduct on the bedside when she requested him to desist from it. Having said this much we will now proceed to briefly consider the grounds, supra, urged for a reversal of the judgment.

1. The argument in support of ground (1) is that the indictment against defendant was murder, which carried with it upon conviction life imprisonment or death, and, therefore, the charge of committing other crimes could add nothing to the punishment and was, therefore, not only surplusage, but prejudicial to appellant's rights. Counsel, however, appear to overlook the fact that under a murder charge the accused may be

convicted of any of the lesser degrees of homicide, none of which are punished with life imprisonment or death and the punishment for which might be augmented to the extent prescribed by the habitual criminal act. If, therefore, the facts in the case brought the offense within any of those lower degrees the increased punishment prescribed by the habitual criminal act would become applicable, and it was not error to incorporate in the indictment the count charging former convictions, and likewise it was not error to introduce the record of them. Furthermore, there was no objection made to that evidence. Therefore, ground (1) is doubly without merit.

2. The court, however—notwithstanding the indictment, and the proof establishing the fact of appellant's former conviction of felonious homicide—failed to instruct on the habitual criminal act and it is insisted by counsel that such failure was and is so prejudicial to his client's rights as to authorize this court to reverse the judgment of conviction. The argument, however, is so devoid of merit as to scarcely require the devotion of either time or space to its consideration. The failure of the court to instruct the jury as contended for by appellant's counsel was an omission prejudicial to the rights of the commonwealth and in favor of appellant, since if the jury had convicted him of voluntary manslaughter with the right to double the punishment under the habitual criminal act the instruction as given took away the right of so increasing the punishment which was clearly beneficial to appellant. See Sections 950 and 951 of Stanley's Instructions to Juries, and cases cited in the notes to the text. There is, therefore, likewise no merit in this ground.

3. The argument in support of ground (3) is more or less perplexing to us because of the entire absence from the record of the grounds urged by him in support thereof. Counsel say that the appropriate language of an instruction on insanity is, that the defendant at the time "had not sufficient reason to know right from wrong," and that "if at the time of the killing the defendant was of unsound mind" as so defined, then the jury should acquit him. The instruction in this case expressly contained the requirements as insisted on by counsel and appears to have been taken from the case of Mathley v. Commonwealth, 120 Ky. 389, 86 S. W. 988, 27 Ky. Law Rep. 785. See also the text and notes there-

to of Stanley's Instructions to Juries, Section 902. There was no evidence of substantial probative force to prove insanity on the part of defendant, but which if it did exist it was of instantaneous appearance and which itself is a most extremely rare occurrence within human experience. It is true some of the witnesses say that when defendant was under the influence of liquor he was quarrelsome and troublesome, with his associates, but such temporary impairments are not to be classified as constituting the degree of insanity relieving one from the consequences of his wilful and malicious crimes. Besides being only temporary they are voluntarily produced by the one who becomes so afflicted and who is always aware of the consequences resulting from his consumption of alcohol. He may not, therefore, be permitted to voluntarily indulge his appetite and later defying the law by destroying the lives of innocent persons or commit other crimes and then escape punishment therefor. Thomas v. Commonwealth, 196 Ky. 539, 245 S. W. 164; Harris v. Commonwealth, 183 Ky. 542, 209 S. W. 509; Montgomery v. Commonwealth, 88 Ky. 509, 11 S. W. 475; Shannahan v. Commonwealth, 8 Bush 463, 8 Am. Rep. 465, and Tyra v. Commonwealth, 2 Metc. 1. Compare also Arnold v. Commonwealth, 194 Ky. 421, 240 S. W. 87, and Barnett v. Commonwealth, 195 Ky. 699, 247 S. W. 937.

In the cited Arnold case it was held that (quoting from the syllabus): "A lack of sufficient reason to know what he is doing, or a lack of sufficient will power to control his actions, which is caused alone by voluntary drunkenness will not excuse a crime." Whether or not that statement of the rule should be unqualifiedly followed in all cases and circumstances need not be determined under the facts disclosed by this record, since appellant's mental condition at the time he so unjustifiably assaulted his wife was not shown to be such as to destroy his mental comprehension of right and wrong, or to deprive him of a knowledge of what he was doing. At the uttermost the alcohol that he had consumed and the length of time following his consumption of it could only produce the usual consequent exhileration resulting therefrom. No total bereavement of reason was shown, and the attempt to exaggerate it to the degree of furnishing an excuse for the commission of crime is unsupported by any testimony in the case. We have here no instance of excusable insanity brought about by long-

continued indulgence in the use of intoxicating liquors, nor have we even a case where the amount consumed on the particular occasion had the effect to deprive defendant of his faculty to distinguish between right and wrong, even should we qualify the rule as announced in the Arnold opinion. The predicament of appellant in this case calls for sympathy on our part, which is so extended, but it cannot be allowed the effect of excusing him from the brutality of his assaults on his innocent victim whereby she was compelled to surrender her life for no cause whatever.

Wherefore, the judgment is affirmed.

The Whole Court sitting.