# Elliott v. Commonwealth.

Dec. 19, 1941.

Zeb A. Stewart and R. C. Browning for appellant.

Hubert Meredith, Attorney General, W. Owen Keller, Assistant Attorney General, and J. B. Johnson for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming..

On a day in October, 1940, the appellant, William Elliott, then about twenty-one years of age, shot and killed Joe Tuggle in the jail of Whitley County. The grand jury of the county later indicted him for murder, the indictment containing counts charging appellant with having previously been convicted of felonies. At the trial of the indictment appellant was convicted of murder and punished by infliction of the death penalty. His motion for a new trial was overruled and from that order, and the judgment pronounced on the verdict, he prosecutes this appeal, urging by his counsel in their brief ·(1) that the indictment was bad for duplicity, in that it charged that defendant had committed two distinct offenses; (2) there was no evidence to authorize a verdict finding defendant guilty of murder, but at most the jury could find him guilty of only voluntary manslaughter; (3) failure of the court to give the whole law of the case to the jury in its instructions; (4) error in refusing competent evidence offered by defendant, and (5) misconduct of the Commonwealth's Attorney in questions asked tendered jurors on their voir dire examination. They will be determined in the order named.

1. The argument in support of ground (1) is that the charge in the indictment accusing defendant of having been convicted of prior felonies is one offense, and that the homicide count contained therein is the preferring of another offense; hence, the duplicity in the indictment contended for. The question thus raised was disposed of by us in the very recent case of Smiddy v. Commonwealth, 287 Ky. 276, 152 S. W. (2d) 949, adversely

to instant counsels' contention. It was therein pointed out (and which the statute permitting habitual prior criminal convictions to increase the punishment expressly prescribes) that the only purpose to be served by incorporating such former convictions is to increase the punishment, when, as a degree of the offense charged in the indictment, the defendant might be convicted of a lower offense not subject to the death penalty, or life imprisonment, and that an indictment containing such charges of former convictions was not intended to accuse the defendant with having committed another independent offense, but was only intended to accomplish the purpose we have indicated. Indeed, the indictment in this case named but one offense—which was "murder"—with a subjoined description as to how it was committed. In this case, as pointed out in the Smiddy case, the jury may have concluded that defendant was guilty of only voluntary manslaughter, in which case the charged former convictions would authorize a verdict of life imprisonment, although the highest penalty fixed for that offense is such confinement for twenty-one years. There is, therefore, no support in the law for this ground, even if it had been properly raised by a demurrer to the indictment, which was not done, and we are compelled to declare it as being without merit.

2. A consideration of ground (2) requires a brief statement of the facts. Defendant was confined in the Whitley county jail after being convicted of one of the felonies charged in the indictment. The deceased was a Turnkey or Deputy Jailer. A friend of defendant called to see him and he was let out in a small lobby in front of the cell chamber while his friend was conversing with him. A number of other persons by the name of Reynolds were present in the same compartment, having gone there to visit one of their relatives who was likewise confined in jail. When each of the visiting persons had finished their mission, a signal was given for the jailer to let them out and to put the prisoners back in their cells. When the deceased responded to that call he was in his shirt sleeves with his pistol in a scabbard by his side, but turned slightly to the rear. After entering through the jail door he shut it, and was engaged in locking it until he put the prisoners back in their cells, when defendant snatched the pistol from his scabbard and demanded exit. The jailer started to regain possession of his pistol when defendant shot him in the abdomen which proved

to be the fatal wound, although another shot was fired after the infliction of the fatal wound and the officer was on the floor, but it was only a flesh wound and a non-fatal one. Not only is the described manner in which the homicide was committed established by a number of the other visitors to the jail, who were immediately present, but likewise by a dying declaration made by the deceased —who survived his fatal wound eight days—but it is also admitted by defendant himself. Even counsel in their brief say: "The evidence relating to the (manner of the) shooting of Tuggle by Elliott" is not materially disputed.

Counsel then recite the facts substantially as we have done supra. But it is argued that there is no proof of malice or premeditation, so as to make the homicide wilful murder. Counsel, however, overlooks the fact that malice or premeditation may be instantly formed in the mind of the perpetrator of a homicide. Also, that where an officer is killed in the discharge of his duty "it is not necessary to constitute the crime of murder that the slayer should have had any particular malice;" provided, of course, that the slaying was not done by the accused in defending himself from an act of the officer in excess of his powers and authority as such. Among the many cases substantially sustaining the proposition we have stated are Mockabee v. Commonwealth, 78 Ky. 380; Doheny & Prather v. Commonwealth, 170 Ky. 474, 186 S. W. 161, 3 A. L. R. 1161, and Marion v. Commonwealth, 269 Ky. 729, 108 S. W. (2d) 721. This ground is, therefore, also without merit.

3. The only case cited in support of ground (3) is Rector v. Commonwealth, 80 Ky. 468, 4 Ky. Law Rep. 323. It only declares that the proper practice is, when there is an habitual criminal act charge contained in the indictment, for the court to require a separate stating by the jury in its verdict as to whether it found defendant on trial was convicted of such prior felonies, and which determination has no relevancy to the question here involved, since the court in this case did not submit to the jury the habitual criminal charge contained in the indictment, and which we held in the Smiddy case, supra, was not error and could in no sense be regarded as prejudicial to defendant's rights. This ground, therefore, is likewise without merit.

4. The comparatively few questions to which the

court sustained the commonwealth's objections, constituting the foundation of counsels' argument in support of this ground, were asked non-expert witnesses and were framed in a way to call for only a conclusion by the witness, notwithstanding other witnesses testifying to the same issue (of insanity of defendant) had been asked similar questions and made similar answers. As an example of the instances complained of, attention is called to the examination of a witness by the name of Petrey who was asked this question: "Tell the jury whether he (defendant) seemed during that time to have a normal mind or intelligence?" The commonwealth objected to the question and the court sustained it. In none of the instances complained of as supporting this ground did the defendant make an avowal as to what the witness would say if permitted to answer. But, over and above all that, a number of defendant's witnesses at the trial testified in answer to questions propounded to them—either properly or improperly framed—and they stated that according to their opinion his mind was weak and below the average of mental capacity. However, a reading of the record fails to reveal where any of them claimed that such deficiency prevailed to the extent of rendering defendant incapable of knowing right from wrong, or the effects and consequences of any act in which he might engage, and which is essential for the excusing of criminal actions so as to render the offender immune from punishment on the ground of insanity.

Other lay witnesses, as well as professional ones, testified for the commonwealth on the issue of sanity and gave it as their opinion that he was sane. Some of the witnesses gave a history of his life, which showed that his surroundings from his youth up were not calculated to produce and foster uprightness and integrity. It was proven that his mother died when he was thirteen months old and he was placed in the care of an aunt to be raised. His father was a ne'er-do-well, engaged in more or less questionable pursuits, such as operating a pool table at places where liquor was sold, and on occasions when appellant would visit his father, who appeared to care nothing for him, he was permitted to loiter around his father's place of business—of the nature and character described—and to witness the surroundings and breathe the social atmosphere generated at such places. It was also shown that sometimes he would leave the home of his aunt, or others with whom he might be temporarily

sojourning, and would be away for days before his whereabouts was discovered. He was thus permitted to wander around and come in contact with all sorts of persons of low and disreputable character, all the while himself possessing—as we think is clearly shown by the record—less intelligence than average youths of the same age. Such environments, surrounding defendant's entire life, not only generate deep sympathy for him, but also furnish a reason to not measure his acts and conduct by the stern rules that should govern that of another more mature in years and more fortunate in the respects mentioned. Since no avowal was made, and since the questions propounded were incompetent for generality, and also since the same facts were testified to by a great number of other witnesses, it is clearly apparent that this ground is also unavailable.

5. To begin with, the first mention of the fact upon which ground (5) is based appears in the motion for a new trial. No other place in the record mentions it. It is contained in no bill of exceptions, and, of course, the record discloses no ruling of the court or any objections that may have been made thereto by defendant's counsel. For this reason alone we are clearly without authority to consider the question on this appeal, and which has been determined in an unbroken line of decisions from this court with which the members of the profession are thoroughly familiar. But, even if the question was properly incorporated in the record, it consisted—as stated in the motion for a new trial and restated in brief of counsel— of the asking of the tendered jurors on their voir dire examination whether they "would vote for the death penalty." It may be true that the usual manner of such inquiries is to ask the juror if he possesses conscientious scruples that would prevent him from returning the death penalty if the evidence justified it. But, clearly, the question, as stated in its improper presentation to this court, substantially complied with the more formal way of making such inquiries, and nothing is pointed out to show that the departure could prejudice the mind of any juror who might be accepted as a member of the panel. It, therefore, becomes clear that by no stretch of the imagination may this ground be sustained.

We have already referred, not only to the conditions surrounding defendant from his youth up to the time of the commission of the offense herein charged, but like-

wise to the subnormal degree of his intelligence. His road has been rough, but had it been smoother he might have traveled it straighter. At the time of the commission of this crime—the punishment for which the jury has demanded his life—he was just budding into manhood, and the verdict clips the budding flower and stops the full bloom thereof, thus depriving him of continued life and consequent opportunity to change or alter his past criminal conduct and to make of himself a peaceful and upright citizen to the extent of his capacity. The law in fixing the punishment for murder at life imprisonment, "or death," clearly contemplated situations where the first alternative (life imprisonment) should be administered; the question being determinable by the sound discretion of the jury as based upon the facts. We would not in the least attempt to condone the crime committed by appellant, or to try to excuse it in the least degree; but we do think that the jury would have followed the intent and purpose of the law more nearly, under the facts in this case if it had prescribed the punishment of life imprisonment. However, our fundamental charter—the Constitution—withholds from us the power and authority to correct such departures, if any, by the jury from what we may conceive to be the more appropriate one. Such corrective authority is lodged elsewhere in the governmental set-up by the Constitution, and by its Section 28 we are forbidden to encroach upon the power so delegated, howsoever much we may believe that the full intent of the law may not have been administered. Our task is complete when we have determined whether or not a litigant has had a trial in conformity with the forms of law, and when that question is determined our authority ceases. We are deprived of the right to extend amelioration howsoever much the case may be one clearly calling for it.

Wherefore, for the reasons stated, the judgment is affirmed.

The whole Court sitting.