# IMPORTANT NOTICE
## <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED:  MARCH 20, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0055-MR

ELVIS ANDERSON                                           APPELLANT

V.

ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE SUSAN S. GIBSON, JUDGE
NO. 22-CR-001569

COMMONWEALTH OF KENTUCKY                        APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

This case is before the Court as a matter of right from Jefferson Circuit Court upon the Appellant's, Elvis Anderson, conviction for murder and two counts of second-degree assault. He was sentenced to twenty years in prison. Anderson brings two arguments on appeal. First, that the trial court erred when it denied lesser-included offense instructions for first-degree manslaughter and assault under extreme emotional disturbance. Second, that the trial court violated due process when it failed to hold a competency hearing mid-trial after Anderson's conduct raised an issue of competency. Upon review, we conclude the trial court did not err in either instance. Anderson's convictions are affirmed.

## I.    Facts

On July 2, 2022, Davon Banks was at his home which he shared with his wife, Jessica, and her mother, Francis Alexander. Francis' son, Larry, was there as well. It was moving day and the process of leaving the home was underway. Across the street, however, Elvis Anderson took a decidedly different view of events. At 10:37 am, he made a call to Louisville Metro Police to complain of "crack smokers" across the street. By 10:44 am, a police cruiser drove down the street but, seeing nothing out of the ordinary, did not stop to investigate further. Francis sat on the front porch, awaiting the landlord, and Banks joined her while holding a machete. Jessica was walking down the street, returning from the store. Anderson, observing from inside his own home, took matters into his own hands.

Anderson, who perceived Banks' handling of the machete to be taunting him, moved his truck from the driveway of his home to the curbside of his home. He exits the vehicle, and at approximately 10:46:30 am, he can be seen by video camera walking towards Banks' home holding a stick. Jessica also observed Anderson as he approached the home. At 10:48 am, Anderson is observed on video camera walking away from Banks' home, stick and machete in hand. In the intervening ninety seconds, the lives of Jessica and Francis were forever changed and the life of Davon Banks was taken.

No video captures the attack. Testimony established that as Anderson walked up the steps of the front porch, Banks inquired, "What's your problem?" Anderson declared, "You are, mother f**ker!" and struck Banks on

2

his head with the stick. Banks stumbled back and Anderson surged forward, taking hold of the machete. The two briefly, if at all, struggled for mastery of the weapon. Anderson prevailed. He proceeded to hack and cut at Banks. The elderly Francis attempted to defend him and received a gash upon her head, exposing her skull, from Anderson. She managed to retreat and find her son, Larry, behind the house. Larry went to get the only weapon he had available—a prop sword. Jessica made it home quickly after the attack had begun. She too entered the fray on behalf of her husband, who was by this time prostrate upon the ground; all but helpless save for Jessica, and, perhaps, Larry with his prop sword. Anderson struck Jessica upon the head as well, almost severing her ear, and knocking her back into the yard, effectively removing her from the fight.

We cannot be entirely certain what happened after this, but the testimony of the medical examiner, Dr. Donna Stewart, suggests a cruel end. Banks suffered ten incise wounds to numerous areas of his body. Three of these wounds were potentially fatal by themselves but the cumulative result of all injuries meant he would bleed out in two to three minutes. Most telling, however, are the wounds to Banks' back and the abrasions on his knees noted by Dr. Stewart. These wounds indicate that Anderson's attack upon Banks continued after Banks was on the ground, making a desperate effort to save his life by crawling away. After the tenth blow was struck, Anderson, as recounted, went back to his home. Larry, late upon the scene, could not help Banks (though perhaps this was fortunate, as a prop sword would surely have been

3

ineffective in combat against an all too real machete). By the time he arrived, Jessica was already on the phone with 911 emergency services, rendering what aid she could to Banks according to the instructions she received. Francis and Jessica would both receive several staples in their heads to heal their wounds, and Jessica would require reconstructive surgery to repair her ear. Banks bled out and died at the scene.

Police arrived and Anderson was taken into custody. He gave an interview to police at the station, which was recorded, and portions of the video were played at trial. Anderson, however, did not testify at trial. The interview revealed that Anderson believed Davon and Larry had entered his home at some point and done something to his dogs as they were not eating properly. There is no evidence to support this. Anderson also told police he did not go "off with some kind of rage or nothing[,]" but intended only to "whoop" Banks and "send him a message" and that after striking him with this stick, he grabbed the machete and "one thing lead to another." Upon cross-examination, the lead investigator, Det. Guetig, also stated that Anderson had told him he "lost it" during the attack. Det. Guetig's investigation also revealed no communication whatsoever occurring between Anderson and Banks or any of the Alexander family prior to the attack, and no testimony to that effect was elicited at trial either.

On the second day of trial, August 30, 2023, Anderson grew agitated after the Commonwealth played some of the video evidence. He asked to leave the courtroom. After discussions with his counsel, Anderson's counsel

4

informed the trial court that Anderson no longer desired to be present at trial. These events will be detailed in greater depth below. The following day of trial, September 1, 2023,[1] the trial court conducted a hearing to determine whether Anderson should undergo a competency examination. After taking evidence, the trial court determined there were no reasonable grounds or substantial evidence to order a competency hearing. For the following days of trial, Anderson was brought into the courtroom and informed he had the right to be present and each day he voluntarily chose to absent himself. Anderson makes no argument on appeal regarding his absence. Prior to the jury determining guilt, Anderson requested but was denied lesser-included offense instructions for first-degree manslaughter and assault with extreme emotional disturbance. This too will be detailed below.

Anderson was eventually convicted as detailed above and sentenced to twenty years in prison; twenty years for the murder of Banks and two five-year sentences for the assaults upon Francis and Jessica, to be served concurrently. The trial court imposed the sentence, and this appeal follows. We now consider the merits.

---

[1] Prior to trial beginning, it had already been determined that August 31, 2023, would not be a trial day. While this predetermined break proved convenient to allow the parties to investigate and prepare for the hearing on September 1, 2023, it should be made clear for chronological purposes that the trial court did not postpone the trial because of the competency issue, save for the time it took to conduct the hearing on September 1, 2023.

## II. Standards of Review

"When the error arises from giving an unwarranted instruction or failing to give a warranted instruction, we review the decision for abuse of discretion." *Commonwealth v. Caudill*, 540 S.W.3d 364, 367 (Ky. 2018).

> No instruction is warranted, of course, unless supported by the evidence, and thus "an instruction on a lesser included offense is appropriate if, and only if, on the given evidence a reasonable juror could entertain a reasonable doubt of the defendant's guilt on the greater charge, but believe beyond a reasonable doubt that the defendant is guilty of the lesser charge."

*Allen v. Commonwealth*, 338 S.W.3d 252, 255 (Ky. 2011) (quoting *Osborne v. Commonwealth*, 43 S.W.3d 234, 244 (Ky. 2001)).

As for the competency issue, there are two interests, constitutional and statutory, that apply, and each have differing standards. *Padgett v. Commonwealth*, 312 S.W.3d 336, 347 (Ky. 2010). "The Fourteenth Amendment due-process right to a fair trial is violated by a court's failure to hold a proper competency hearing where there is *substantial evidence* that a defendant is incompetent." *Id.* (quoting *Filiaggi v. Bagley*, 445 F.3d 851, 858 (6th Cir. 2006)). "In contrast, the statutory right to a hearing requires only that, once an exam and report have been ordered based on reasonable grounds and the report has been filed with the court, the court *shall* conduct a competency hearing." *Id.* (citing KRS 504.100(3)). In brief, the constitutional threshold for raising an issue of competency is higher than the statutory threshold, and reasonable grounds to doubt competency may exist even if substantial evidence to doubt competency does not. *Id.* at 348.

6

In either case, however, there must be some evidentiary showing—either substantial evidence or reasonable grounds—before a competency hearing is mandatory. "The standard of appellate review of a trial court's competency decision is '[w]hether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial.'" *Woolfolk v. Commonwealth,* 339 S.W.3d 411, 423 (Ky. 2011) (quoting *Thompson v. Commonwealth,* 56 S.W.3d 406, 408 (Ky. 2001)).

## III.  Analysis

### A. First-degree Manslaughter Instruction Unwarranted

Anderson makes two arguments to justify a first-degree manslaughter instruction. The first, under KRS 507.030(1)(a), is that there was evidence to support the belief that he only intended to injure Banks. Second, he argues under KRS 507.030(1)(b) that his conduct was under extreme emotional disturbance. Considering the first argument, the answer to whether Anderson was entitled to a first-degree manslaughter instruction is somewhat complicated by the fact that the murder instruction given below did not distinguish between intentional murder and wanton murder. "[W]e strongly emphasize that, when intentional and wanton murder are included in a single instruction, the preferred practice is to include a form verdict that requires the jury to state whether guilt is found under the theory of intentional murder or under the theory of wanton murder." *Hudson v. Commonwealth,* 979 S.W.2d 106, 110 (Ky. 1998). Anderson concedes that it is "impossible to know" which

7

theory the jury convicted him under, yet he otherwise persistently states he was convicted of wanton murder. The Commonwealth, however, is equally insistent that the evidence at trial conclusively demonstrated intent, and that Anderson was therefore convicted of intentional murder.

That first-degree manslaughter is a lesser-included offense to intentional murder is well-accepted. *Allen*, 338 S.W.3d at 256. On the other hand, this Court has not yet resolved whether first-degree manslaughter is properly a lesser-included offense to wanton murder. *Id.*

> Arguably, causing a death while intending to seriously injure is causing a death with a lesser sort of culpability than causing a death through aggravated wantonness, a mental state the law deems as culpable as the intent to kill. Arguably then, under KRS 505.020(c) first-degree manslaughter could be considered a lesser offense included within wanton murder. The fit is not an easy one, however . . . and we might reject it were it not that for double jeopardy purposes it appears likely that first-degree manslaughter would be deemed included within the wanton murder charge. *See, e.g., Ervin v. State,* 991 S.W.2d 804 (Tex. Crim. App. 1999) (collecting cases considering whether a single killing can be punished more than once under different homicide statutes).

*Id.* Unfortunately, this case does not afford an opportunity to clarify the conundrum.

Given the unsettled state of this part of the law, and until such time that it is settled, we have held "the Commonwealth should not be able, through artful pleading, to deprive a defendant of a colorable defense." *Id.* In other words, because a lesser-included offense is functionally a defense to the greater-charged offense, ambiguity as to whether the charge is intentional murder or wanton murder should not control the outcome of whether a first-

8

degree manslaughter instruction is warranted. "We do not believe . . . [a defendant's] entitlement to the instruction should hinge on how the Commonwealth pled its case." *Id.* The ambiguity arises here because the Commonwealth argues the murder was intentional, but it reaped the benefit of a murder instruction that included a wanton state of mind.

Thankfully, the Commonwealth has not argued the lesser-included offense instruction is not warranted because of a charge of wanton murder. Instead, it argues the evidence simply does not permit a belief that Anderson only attacked Banks with an intent to injure, rather than kill. The undisputed medical testimony was that Anderson cut or hacked Banks ten times with the machete; three of these wounds were mortal; and injuries to Banks' back and the abrasions on his knees indicated that Anderson's attack upon Banks continued as Banks attempted to crawl away.

Anderson argues, however, that his intent only to injure was reasonably raised by the fact that when he proceeded to the Banks' home, he only grabbed a stick; and his statement to police afterwards that he only intended to "resolve a dispute" with them. Finally, he points to the fact that he shouted "B*tch, if I catch you up here again . . ." after he had returned to his own home. This statement, he argues, shows that he was not aware that he had killed Banks, therefore, that he did not intend to kill Banks.

In *Hudson,* we stated, "[o]nce the facts of a killing are established, whether the act itself is murder depends upon the mind of the killer. The state of that mind at the time of the killing is almost never clear, not even to the

9

defendant himself." *Hudson*, 979 S.W.2d at 110. Thus, "[i]ntent to kill can be inferred from the extent and character of a victim's injuries." *Id.* But "neither the inference nor the presumption of intent are mandatory." *Id.* In brief, it is always a jury question. But we have held that medical evidence of the victim's wounds, when undisputed, can be such as to preclude a reasonable belief that the killing was done with an intent to injure. *Caudill v. Commonwealth*, 120 S.W.3d 635, 668 (Ky. 2003). In *Caudill*, the victim suffered "at least fifteen blows to the head with a hammer-like object. The blows ranged from those that caused lacerations to those that fractured the skull causing fragments of bone to be driven into the brain." *Id.* In light of this, we held there was no evidentiary basis for the jury to reasonably doubt the intent to kill as to justify a first-degree manslaughter instruction. *Id.*

We conclude this case is similar enough to *Caudill* to justify its application here. Anderson's argument that his intent when he grabbed a stick and walked to the Banks' home justifies a reasonable belief that he only intended to injure Banks is unpersuasive because it assumes that Anderson's intent to injure or kill had to be established when he left his home. That is not true. "[M]alice or premeditation may be instantly formed in the mind of the perpetrator of a homicide." *Elliot v. Commonwealth*, 161 S.W.2d 633, 634 (Ky. 1941). "[I]t is immaterial how suddenly or recently before the killing such determination was formed." *Moss v. Commonwealth*, 332 S.W.2d 650, 651 (Ky. 1959). Thus, regardless of what Anderson's intent may have been when he left his home, the question is "his state of mind with respect to the result of his

10

act[,]" i.e., the hacking and cutting of Banks with a machete. *Elliott v. Commonwealth*, 976 S.W.2d 416, 422 (Ky. 1998).

Grabbing a stick prior to the attack has little bearing on Anderson's state of mind with respect to the result of his attack on Banks with the machete. The undisputed medical testimony is that Anderson struck him ten times and persisted in his attack even after Banks was on his belly, vainly attempting to save his life, despite knowing the death-dealing blows may have already been struck upon him.[2] Nor does Anderson's statement after the attack alter our conclusion. Anderson's argument assumes the statement was made specifically to Banks and therefore is evidence that he believed he had not in fact killed Banks. Under the totality of this evidence, however, we are reluctant to hold that merely being unaware the result had been achieved is good evidence to show the result was not intended. Moreover, it is just as likely Anderson's statement was aimed at the remaining members of the family rather than to Banks specifically. For these reasons, we conclude the trial court did not abuse its discretion in refusing to give a first-degree manslaughter instruction under KRS 507.030(1)(a).

As to whether Anderson was entitled to a first-degree manslaughter instruction under KRS 507.030(1)(b)—extreme emotional disturbance—we conclude the evidence was insufficient to warrant such an instruction.[3]

---

[2] Jessica testified Banks was pleading, "Help me! He's killing me!" during the attack.

[3] Anderson also sought lesser-included offense instructions for assault under extreme emotional disturbance pursuant to KRS 508.040(1). Because these lesser-

> To support a manslaughter instruction based upon extreme emotional disturbance, the evidence must have been such that it could induce a reasonable jury to believe that Appellant acted violently because of "a temporary state of mind so enraged, inflamed, or disturbed as to overcome his judgment, and to cause him to act uncontrollably from an impelling force of the extreme emotional disturbance rather than from evil or malicious purposes."

*Holland v. Commonwealth*, 466 S.W.3d 493, 503 (Ky. 2019) (quoting *McClellan v. Commonwealth,* 715 S.W.2d 464, 468–69 (Ky.1986)).[4] There must be a triggering event, specific and identifiable, to justify the instruction. *Id.* at 504.

Anderson's argument that he was suffering from extreme emotional disturbance is based on the assertion that Banks was on his own porch, handling the machete, which Anderson took to be taunting; and a vague allegation that he believed Banks and Larry had burgled his home and messed with his dogs. There is no evidence, however, that his home was broken into; no evidence that the dogs were injured or tampered with; and, obviously, no evidence that either Banks or Larry had committed such acts. And much like in *Holland,* we do not believe the assertion that Banks was handling a machete in a taunting manner sufficient to justify the instruction.

In *Holland,* we rejected "[t]he argument that the sight of . . . [the victim] charging Appellant wielding a board as a weapon could have been a triggering

---

included offense instructions are also resolved on the presence or absence of an extreme emotional disturbance, our conclusion that there was no extreme emotional disturbance to justify a lesser-included instruction for first-degree manslaughter under KRS 507.030(1)(b) applies to the lesser-included offense instructions for KRS 508.040(1).

[4] *See also Thomas v. Commonwealth,* 170 S.W.3d 343, 347 (Ky. 2005) (applying same standard to assault under extreme emotional disturbance).

12

event . . . given the context of the altercation." *Id.* at 504. Likewise, in the context of this altercation, the sight of Banks on his own porch handling a machete was not a sufficient triggering event. In response to this conduct and based upon Anderson's unsubstantiated belief regarding his dogs, he proceeded to grab a stick and walk to the Banks' home. When Davon Banks inquired of the stick-wielding Anderson, "What's your problem?", Anderson responded, "You are, mother f**ker!" and struck him upon the head. Anderson later told police explicitly that he did not go off in a rage but proceeded to Banks' home with a specific purpose to "whoop" Banks and "send a message." Under the evidence, the trial court concluded, "there is simply no identifiable triggering event . . . there is absolutely no evidence in the record of . . . any communication whatsoever between the parties." We agree. Still more, however, there is nothing approaching the kind of enraged or inflamed behavior that would warrant a jury to conclude Anderson acted uncontrollably due to an extreme emotional disturbance. The trial court did not abuse its discretion in refusing lesser-included offense instructions predicated upon extreme emotional disturbance.

### B. No Error in Declining to Order a Competency Examination

Finally, Anderson argues that he was deprived of a competency hearing during trial. Anderson has framed this argument principally upon constitutional grounds but nonetheless raises the statutory right; and the record supports that both KRS 504.100 and the Due Process right were raised to the trial court. Therefore, our review will be for the existence of reasonable

13

grounds because the absence of reasonable grounds to doubt competency for trial necessarily results in the absence of substantial evidence to doubt competency for trial.

As noted in Section I, Anderson's alleged incompetency was first raised on the second day of trial after the Commonwealth played some video evidence. Anderson alleged he was being set up by the system and a general allegation of corruption; that the videos were not the ones he had been shown before trial; and that the videos shown were somehow doctored or staged and that a "clone" of him was used in the videos. We make clear that it is this last allegation that makes this a competency issue. The belief of being set up by the government and corruption in the judicial system is all too common amongst criminal defendants and does not by itself raise a question of competency but instead, at best, reflects ignorance as to the what the law is and how the criminal justice system functions. A belief that the evidence shown at trial is not the same evidence disclosed in discovery also does not by itself reflect incompetence but in fact demonstrates the defendant is alert and aiding in his own defense. Thus, the allegation that the videos were doctored or staged, and a clone was used, transforms this into a competency question.

Importantly, however, when Anderson was brought before the trial court to explain himself, although he strenuously maintained it was not him in the videos, he nonetheless declared, "I'm not on no medication. I'm not high. I'm none of that." He then further declared, "I'm not crazy. I'm not retarded. I'm not on no pills. I'm not on nothing." While Anderson's explanation to the trial court

14

was no model of oratory, it is clear upon review of the trial video that he was aware of his surroundings, was alert, and was able to satisfactorily articulate coherent enough grounds for his displeasure—however erroneous and fantastical those grounds were.

The following day of trial, a hearing was held to determine if a competency exam should be ordered. The Commonwealth played a phone call of Anderson recorded on August 10, 2023, almost three weeks before trial. Anderson was giving directions on how to find a suit in his house for trial. But towards the conclusion of the call, Anderson stated,

> Now listen to me, some good things gonna work out. It's gonna work out. Okay? Now don't ask me how I know it, but I know it. It's gonna work out. It's gonna be fine. Just don't give up on me yet. Don't do nothing with the house yet. Just wait for this—is final and wait till it's done . . . I'm looking for a good outcome on the 29th, okay?

August 29 was the first day of trial.

Cherie Hopkins was then called to testify. Hopkins worked at Louisville Metro Department of Corrections as a nurse contractor. She testified she is not a mental health professional. She testified KCPC had requested her to evaluate Anderson after the second day of trial for any abnormal behaviors. This examination occurred on August 31, 2023. When she went to evaluate Anderson, she first asked the officers accompanying him if they had noticed any abnormal behavior to which they informed her they had not. Hopkins then noticed Anderson entering the building with a fellow inmate. Hopkins did not immediately introduce herself to Anderson so as to observe his behavior and communication abilities. She testified Anderson was happy and excited, and

stating he was possibly going to go home because there was going to be a mistrial. When Hopkins and Anderson went back to his cell, she testified, she was able to take his vitals; that he was alert and oriented; and could identify the year, his date of birth, his age, and the president. Hopkins testified Anderson was normal for these assessments. Based upon her written report, Hopkins recalled when she was observing Anderson that he was jumping up and down and stating he was going to go home soon.

Anderson did not put on any evidence at the hearing. Anderson argued that both the phone call and the medical assessment of Hopkins had occurred prior to a formal motion for a competency hearing had been made to the trial court and therefore objected to this evidence even being considered.[5] Finally, Anderson argued Hopkins was not a mental health professional and therefore her testimony was incompetent as to the state of Anderson's competency. The Commonwealth argued in response that Anderson's conduct throughout his incarceration and at trial was never an issue and never raised any question of competency. She noted that he was able to follow social cues, courtroom directions, and had not been disruptive at trial. She insisted that the only evidence of incompetency was Anderson's "rant" on the second day of trial which was subsequently belied by Hopkins' observations of Anderson as

---

[5] This specific issue is not raised in Anderson's brief to this Court. We note, however, that on August 30, 2023, the day of Anderson's disputation with the evidence, his counsel had in fact told the trial court that he believed Anderson's statements had raised the question of competency. Granting that a formal motion to evaluate competency had not been made on August 30, we nonetheless agree with the trial court that it was clear to both parties whether competency should be evaluated was an issue to be resolved.

16

happy, excited, and jumping at the thought of a mistrial and the possibility of going home.

The trial court ruled that up until the second day of trial, Anderson was acting and communicating normally with his lawyers and with other persons. The trial court also noted Hopkins' testimony regarding Anderson's behavior and statements indicated he had a preconceived motive to act as he did on August 30. The trial court specifically ruled there was no evidence of incompetency. Finally, the trial court buttressed its ruling by noting Anderson has no history of mental illness; had no history of being unable to participate at trial; and that he was able to converse with her as to his reasons why he did not want to participate at trial and his view of the evidence. Therefore, according to the trial court, there was not "anything of a mental nature which has precipitated this."

"[T]he United States Supreme Court held that a defendant is competent if he can 'consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" *Woolfolk*, 339 S.W.3d at 422 (quoting *Godinez v. Moran*, 509 U.S. 389, 396 (1993)). We have also endorsed the writings of Professors Lawson and Fortune, that "there are two distinct matters to be determined:

> (1) whether the defendant is sufficiently coherent to provide his counsel with information necessary or relevant to constructing a defense; and

> (2) whether he is able to comprehend the significance of the trial and his relation to it. The defendant must have an 'ability to confer

> intelligently, to testify coherently, and to follow the evidence presented.' It is necessary that the defendant have a rational as well as a factual understanding of the proceedings.'"

*Id.* (quoting Robert G. Lawson & William H. Fortune, Kentucky Criminal Law, § 5–4(b) (Lexis 1998)). After recitation of the facts, we conclude the trial court did not err in concluding there were no reasonable grounds to doubt competency. The only evidence supporting that belief were Anderson's statements to the trial court on August 30, yet those statements were belied by his conduct observed the very next day by Hopkins. The test of reasonable grounds or substantial evidence is necessarily based upon the totality of evidence available. Although Anderson's statements in isolation could support a finding of reasonable grounds to doubt competency, their quality as to that question were substantially diminished by his observed behavior and statements the next day—he was happy and excited based on a belief that a mistrial would be declared, and he could possibly go free. Moreover, the utter lack of any mental health issues or any prior conduct that would have raised even the slightest suspicion of incompetency militates in favor of the trial court's conclusion. Finally, the trial court held, and we cannot but agree, that Anderson was able to articulate the grounds for his dispute with the evidence regardless of the nature of those grounds; and that he was able to make an informed decision as to whether he was going to continue to participate in his trial. We hold any reasonable judge, faced with the same circumstances as the trial court below, would not have experienced a doubt as to Anderson's competency.

18

## IV.    Conclusion

For the aforementioned reasons, Anderson's convictions are affirmed.

All sitting. Lambert, C.J.; Bisig, Conley, Goodwine, Keller and Nickell, JJ., concur. Thompson, J., dissents by separate opinion.

THOMPSON, J., DISSENTING: I dissent as I disagree with the majority opinion's reasoning that there was insufficient evidence to require an instruction on extreme emotional disturbance (EED). The majority relies on the fact that the supposed provocations for Anderson killing Banks and assaulting Francis and Jessica (his belief that the "crackheads" across the street were breaking into his home and "messing" with his dogs, causing them not to eat, and Banks and Larry were taunting him with knives and twirling a machete around for Anderson to see), could not reasonably enrage, inflame, or disturb him so as to overcome his judgement and cause him to act uncontrollably. Essentially, the majority concludes that it was unreasonable for Anderson to become enraged where "[t]here is no evidence . . . that his home was broken into; no evidence that the dogs were injured or tampered with; and, obviously, no evidence that either Banks or Larry had committed such acts" and, therefore, rejects that such acts could reasonably trigger him, and determines that Banks's handling of the machete in a taunting manner, when considered alone, was insufficient to justify the instruction. Later, the majority opinion again states that Anderson had an "unsubstantiated belief regarding his dogs."

We are not, however, to reject events as triggers if they are "unsubstantiated" or "irrational." We are not to judge the reasonableness of the

19

triggers under a reasonable person standard. Just because there is no available proof to support Anderson's belief that his neighbors went into his home and did something to disturb his dogs or that his neighbors were intending to taunt and threaten him, and we would not react as Anderson did under such circumstances, by becoming enraged and engaging in violence, does not disqualify him for an instruction for EED.

Kentucky Revised Statutes (KRS) 507.020(1)(a) provides:

[A] person shall not be guilty [of murder] under this subsection if he acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, *the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation <u>under the circumstances as the defendant believed them to be</u>*.

As explained in *Benjamin v. Commonwealth*, 266 S.W.3d 775, 783 (Ky. 2008), this standard is "one of subjective reasonableness, where reasonableness is determined from the perspective of the defendant." Thus, we must view the triggering event(s) "subjectively from [the defendant's] perspective." *Park v. Commonwealth*, 413 S.W.3d 638, 644 (Ky. App. 2012). We must keep in mind that "the triggering event for extreme emotional disturbance may 'fester in the mind' before surfacing to exact its damage." *Benjamin*, 266 S.W.3d at 783 (quoting *Springer v. Commonwealth*, 998 S.W.2d 439, 452 (Ky. 1999)).

At trial, Detective Guetig, admitted that when he questioned Anderson, Anderson explained that he believed they had "messed with" his dogs, they were not nice guys, the dogs would not eat, and he saw Banks and Larry

outside showing their big blades, and spinning the machete, said "he had lost it" and interpreted the twirling of the machete as them letting him know that they were "ready for me" and that "I don't know what they doing, man. I panicked, I panicked, I blew it." While other portions of his statement may go against such a defense, I believe this is enough to require an instruction on EED because Anderson established a sufficient triggering event when viewed from Anderson's perspective. Our courts should instruct juries on all lesser-included offenses which are reasonably supported by the evidence and trust them to sort out which crimes are proven beyond a reasonable doubt. The jury's decision to only sentence Anderson to twenty years for the murder, indicates to me that the jury may have agreed that Anderson was acting under EED. Accordingly, I would reverse for a new trial.

COUNSEL FOR APPELLANT:

Michael C. Lemke

William E. Sharp

COUNSEL FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Courtney J. Hightower
Assistant Solicitor General